The judgment is reversed, and the cause remanded.

PER CURIAM.

The foregoing opinion of the Commission of Appeals has been examined by the judges of the Court of Criminal Appeals and approved by the court.

## THOMPSON v. STATE.
### No. 16787.

Court of Criminal Appeals of Texas.
May 30, 1934.

Frank Sparks, of Eastland, for appellant.

Lloyd W. Davidson, State's Atty., of Austin, for the State.

CHRISTIAN, Judge.

The offense is theft; the punishment, confinement in the penitentiary for ten years.

The record is before us without a statement of facts or bills of exception. No question is presented for review.

The judgment is affirmed.

PER CURIAM.

The foregoing opinion of the Commission of Appeals has been examined by the judges of the Court of Criminal Appeals and approved by the court.

## SOUTHLAND LIFE INS. CO. v. DUNN.
### No. 3020.

Court of Civil Appeals of Texas. El Paso.
May 24, 1934.

Rehearing Denied June 14, 1934.

George E. Seay and Seay, Malone & Lipscomb, all of Dallas, for appellant.

J. Lee Zumwalt and Sullivan & Wilson, all of Dallas, for appellee.

HIGGINS, Justice.

On March 3, 1926, the Southland Life Insurance Company issued to Ive Dunn a combination life and disability policy of insurance. The disability terms of the contract provided that if the insured shall furnish satisfactory proof to the company that he has become wholly and permanently disabled so that he is and will be permanently, continuously, and wholly prevented thereby from performing any work or engaging in any occupation or business for compensation or profit, then the company will: First, waive the payment of all premiums thereafter becoming due under the policy during such disability; second, pay as an annuity to the insured $20 and a like amount each month thereafter during the continuance of said disability until the death of the insured. It was further provided that, without prejudice to any other cause of disability, the entire and irrecoverable loss of sight of both eyes would be considered as total and permanent disability.

Dunn filed this suit against the company alleging that due to cataracts he had suffered the entire and irrecoverable loss of the sight of both eyes on July 1, 1931, and thereby become wholly and permanently disabled. He further alleged that subsequent to his disability he had been compelled to pay premiums upon the policy under threat of the defendant that it would cancel the policy. He sought to recover back the premiums alleged to have been so paid under duress and the monthly payments of $20 since disability, and for the statutory penalty and attorney's fees.

The findings of the jury are substantially as follows: (1) That the plaintiff, Ive Dunn, suffered such an impairment of the sight of both of his eyes as to prevent him from performing the substantial duties of any occupation or labor; (2) that this impairment was suffered in July, 1931; (3) that his condition had remained continuously the same; (4) that the impairment of his eyesight is permanent; and (5) a reasonable attorney's fee for plaintiff's attorney was $350.

Judgment was rendered in favor of the plaintiff for $480, the amount of past-due monthly payments with interest thereon and 12 per cent. penalty thereon; for the amount of the attorney's fee fixed by the verdict, and for two premiums of $95.10 each.

The testimony shows plaintiff had a mature cataract on his left eye and was a fit subject for a cataract operation.

Plaintiff's doctor, Dr. Jones, in February, 1933, had recommended that said cataract operation be performed; defendant offered to pay for said operation; an operation for a senile cataract, which was the type of cataract plaintiff had, is a relatively simple operation which could be performed by a capable eyeman without pain or suffering and without any great risk to the health of the subject; that in the vast majority of cases where such operations were performed the party's vision was either entirely or very substantially restored, and in many instances full vision was achieved as a result of an operation. Dr. Jones says 90 per cent. of operations are successful in restoring sight entirely or improving sight; Dr. McLaurin, 85 per cent.; Dr. Hall, 90 per. cent. Dr. McLaurin testified that a large number recover 20/20 vision, which is normal vision. The testimony further showed that plaintiff was in good physical condition.

During the latter part of 1931 plaintiff had an incipient cataract on his left eye and could still see quite a bit out of that eye, but finally his vision in his left eye became so obscured by the cataract that finally when Dr. McLaurin and Dr. Jones examined him in February, 1933, he only had light perception in that eye. It is also shown that there was nothing to indicate a diseased condition of the back part of plaintiff's left eye, and his vision was obscured only in consequence of a senile cataract.

With reference to the chances which Mr. Dunn had of having his vision restored to his

left eye, Dr. McLaurin testified: That on February 21, 1933, he made a thorough examination of both of plaintiff's eyes, first taking a careful history of his past eye condition, and then examining the various structures of the eye and making a record of his vision; he found that the plaintiff in his left eye had a senile cataract, which was one that depended upon the advancing years of life, the change or opaqueness in the lens being caused by old age; that plaintiff had perception of light in this eye, but could not determine color; that from his examination of plaintiff, he was of the opinion and believed that plaintiff could probably recover a vision that would vary anywhere from 20/20 to possibly 20/40 vision in that left eye and very likely 20/20 vision, 20/20 vision being normal vision and meaning that a person can see at 20 feet a letter that the average man can see at that same distance; this vision would be achieved with the use of a glass after the operation.

The testimony of both plaintiff's doctor, Dr. Jones, and of Dr. Hall, who operated on plaintiff's right eye, and who was placed on the stand by the defendant, are in accord with the conclusion that the sight in Mr. Dunn's left eye could be restored by an operation.

Dr. McLaurin testified that the probability of restoration of vision in the left eye by an operation was excellent.

Dr. Hall stated the probability of such restoration was very good.

In regard to plaintiff's right eye the testimony showed that in the first part of 1932, a senile cataract was removed from his eye by Dr. Hall, and plaintiff regained 20/100 vision with the aid of the glasses he wears. Before the operation he could see nothing with this right eye except light. Dr. Straus testified he could fit plaintiff with a lens which would give him 30/100 vision and Dr. McLaurin stated he could fit a lens that would give plaintiff 65/100 vision in this eye. Dr. McLaurin's testimony, however, shows that in February, 1933, there was a secondary cataract on plaintiff's right eye caused by leaving a little portion of the lens in the eye during the removal of the cataract. He testifies:

"Q. Was there anything in that right eye to obscure his vision, what vision he did have? A. Yes sir.

"Q. State to the jury what it was. A. The lens, the crystalline lens of the eye is covered by a capsule. It is enclosed in a capsule known as the capsule of the lens. In the removal of his cataract he had what we would call an extra capsule operation. I mean by that the contents of the lens had been re-moved but the capsule had not been removed and the capsule is opaque and forms a veil in the pupillary region so that he cannot see through it. That is what is commonly known as a secondary cataract. It obscures the possibility of light rays going through the pupil to be placed on the retina where the impressions are actually received.

"Q. You found that in Mr. Dunn's case? A. I did.

"Q. Can that be corrected? A. Yes sir.

"Q. How do you do that, doctor? A. By splitting that capsule. It is an operation where you go in with a very small needle knife and split that capsule and as you do split it it is a fibrous tissue and pulls open and makes a wide opening through which the light rays can pass. In other words, it serves as a veil at present, but the idea of the operation is to open that veil, that opaque layer that lies between the outside and the inside of his eye.

"Q. In your opinion state what result would be achieved by a second operation on Mr. Dunn's right eye? A. I believe he could expect excellent results.

"Q. Just how high would there be a chance of restoring his vision? A. We possibly could restore his vision to normal again and certainly close to normal."

After testifying that there was an excellent chance of greatly improving plaintiff's vision in his right eye by means of a secondary cataract operation, Dr. McLaurin further testified:

"Q. Now, doctor, it has been brought out here in this man's right eye the fact there was a secondary membrane or secondary cataract would cloud his vision in the eye a little bit. Now, if this is so, what effect would an operation have on that eye? A. You would remove that or rather you would split that membrane which forms a so called secondary cataract and make it possible for him to see far better than he sees at present.

"Q. Is that operation, the secondary cataract, is that as hard an operation as a cataract in the first instance where you take out the entire lens? A. No."

Dr. Hall states that an operation for a secondary cataract is a much simpler operation than an operation for a primary cataract, and where a part of the capsule of the lens is left after an operation for a cataract, thus causing a slight opaqueness which is referred to as a secondary cataract, the membrane may be slit and divided and opened, just as slitting a sheet, thereby letting more light in through

the pupil of the eye and improving the vision.

Defendant requested the submission of issues inquiring whether plaintiff's vision in his left eye could be entirely restored or substantially improved by an operation by a capable eyeman, and whether or not his vision in his right eye could be entirely restored or substantially improved by an operation on that eye, and further whether or not an ordinarily prudent man in the same or similar circumstances as the plaintiff would undergo a cataract operation on his left eye and a separate and distinct issue to the same effect on the right eye. All of these issues were refused.

The court gave this definition in connection with issue 4: "By the word 'permanent,' as used in Special Issue No. 4, is meant a lasting disability which will not pass away."

### Opinion.

■■■ The plaintiff's theory is that he has become wholly and permanently disabled because he has suffered the entire and irrecoverable loss of the sight of both eyes by the development of cataracts. The true fact issue is whether he has suffered the entire and irrecoverable loss of the sight of both eyes.

If so, he has become wholly and permanently disabled within the meaning of the policy. If the loss of sight is not irrecoverable, then liability on the part of defendant has not attached. This is obvious under the terms of the policy.

Webster defines "irrecoverable" as "not to be recovered, regained, or remedied; as, an irrecoverable loss."

An entire loss of the use of a limb or organ of the body, which loss may be completely or substantially recovered, regained, or remedied, by proper medical or surgical treatment and which treatment would be undergone by an ordinarily prudent person under the same or similar circumstances, is not to be justly considered as an irrecoverable entire loss.

It is either a completely recoverable loss or a loss which is partially recoverable.

One who sustains a broken arm suffers the entire loss of the use of such arm. If proper treatment be not had, such loss may become irrecoverable, but no one would contend that a mere broken arm ordinarily constitutes an entire and irrecoverable loss of its use.

We can see no valid reason why one who has suffered the entire loss of sight by cataracts on his eyes is not governed by the same considerations. The evidence is certainly sufficient to raise an issue as to whether an ordinarily prudent person under such circumstances would undergo an operation for removal of the cataracts. The evidence also shows the loss of sight may be restored or substantially improved. In the one event the loss of sight would be recovered; in the other event it would be partially recovered, thus creating a partial rather than a complete disability.

In either event the plaintiff in this case could not recover because under the terms of the policy the loss of sight in both eyes must be "entire and irrecoverable."

The assignments are sustained which complain of the refusal to submit the requested issues indicated.

■ The assignment is also sustained which complains of the definition given of the word "permanent." The definition as given would ordinarily be correct and sufficient but as applied to the present facts it ignores the considerations to which we have referred in sustaining the assignments above mentioned; and is, for such reason, inadequate and erroneous as applied to the present facts.

■ Those assignments are also sustained which complain of the refusal to submit issues relating to partial disability. The evidence raises such issue.

■ It is true the issue is comprehended in the first finding, but the defendant was entitled to an affirmative submission of the defenses pleaded by it and raised by the evidence. Indemnity I. Co. v. Boland (Tex. Civ. App.) 31 S.W.(2d) 518; Texas E. I. Ass'n v. Galloway (Tex. Civ. App.) 40 S.W.(2d) 973; Indemnity I. Co. v. Sterling (Tex. Civ. App.) 51 S.W.(2d) 788.

■■ Those assignments are also sustained which question the sufficiency of the petition to authorize the recovery of the statutory penalty and attorney's fee.

The only allegations which can be considered as supporting such recovery are that "plaintiff furnished proper proofs and made demand upon the defendant for the payment of the same, and the defendant has failed and refused to pay the same, and has failed and refused to waive the payment of premium, as also provided under the said policy of insurance"; that "the proper proofs were furnished to the defendant of such facts and demand made on the defendant for the payment of the sum of $20.00 per month, and the waiver of the payment of premium, all of which the defendant has failed and refused to do"; "that defendant failed and refused to pay to

the plaintiff the sum of $20.00 per month," or to waive the payment of the premium, and plaintiff was compelled to employ Sullivan & Wilson to bring this suit, and therefore prays for recovery of penalty of 12 per cent. and attorney's fees of $350.

The statute (Vernon's Ann. Civ. St. art. 4736) is highly penal and must be strictly construed. Mutual L. I. Co. v. Ford, 103 Tex. 522, 131 S. W. 406.

The allegations noted are insufficient to support recovery of the penalty and attorney's fee. National Co. v. Mahoney (Tex. Civ. App.) 296 S. W. 335.

We also regard the evidence as insufficient to support such recovery. In view of retrial, discussion of such evidence is omitted.

The point presented by propositions 22 to 25, if well taken, can readily be cured by amendment.

Various assignments complain of improper argument of counsel for appellee. Some of the argument is objectionable and possibly reversible in its nature. The strict rules relating to argument, as laid down in many decisions of the Supreme Court and Commissions of Appeal, are well known. Upon retrial the argument should be in conformity with such rules.

Reversed and remanded.