Robert LEE BOONE, Appellant,

v.

UNITED FOUNDERS LIFE
INSURANCE COMPANY
of Texas, Appellee.

No. 17957.

Court of Civil Appeals of Texas,
Fort Worth.

April 20, 1978.

Rehearing Denied May 18, 1978.

Dushman, Greenspan & Friedman, and Jack Friedman, Fort Worth, for appellant.

McGuire, Levy, Collins & McCurley, and Albert Levy, Irving, for appellee.

## OPINION

SPURLOCK, Justice.

This is an action by an insured against his insurer for recovery under an insurance policy for "entire and irrecoverable loss of sight" in one eye. After a nonjury trial, the trial court rendered a take-nothing judgment against the plaintiff. From this judgment, the plaintiff has perfected his appeal.

We reverse and remand.

The insurer issued a policy which insured the plaintiff for $2500 for the "entire and irrecoverable loss of sight" in one eye. On September 6, 1974, while the policy was in force, the plaintiff was struck in the left eye by a piece of shattered glass, which resulted in an extensive laceration and loss of vision in that eye. Surgery was initially performed on September 8, 1974, in order to close the laceration of the cornea. Surgery was also performed on October 2, 1974, in order to remove a traumatic cataract that had developed in the eye. Later, a conjunctival cyst developed in the left eye, necessitating a third operation; this last operation was performed on July 9, 1976.

The trial court made the following findings of fact:

"1. The Court finds that the loss of sight in Plaintiff's eye, within ninety days of the date of the accident in question, was entire." (The insurer does not attack this finding of the trial court by way of cross assignment of error.)

"2. The Court finds that the loss of sight in Plaintiff's eye, within ninety days of the date of the accident in question, was not irrecoverable.

"3. The Court finds that a reasonably prudent person, under the same or similar circumstances as those of the Plaintiff, would have submitted to proper medical and surgical treatment to seek recovery of the loss of sight."

Based upon these findings of fact, the court's conclusion of law was that the plaintiff was not entitled to benefits under the terms of the insurance policy in question.

By his first point of error, plaintiff contends that the "finding of the trial court that the loss of sight in question was not 'irrecoverable' is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust."

The applicable rule of law was set forth in the case of *Southland Life Ins. Co. v. Dunn,* 71 S.W.2d 1103, 1106 (Tex.Civ.App.— El Paso 1934, Writ Dism'd), wherein the court wrote:

"An entire loss of the use of a limb or organ of the body, which loss may be completely or substantially recovered, regained, or remedied, by proper medical or surgical treatment and which treatment would be undergone by an ordinarily prudent person under the same or similar circumstances, is not to be justly considered as an irrecoverable entire loss."

This same rule was set forth in the case of *Reliable Life Insurance Company v. Steptoe,* 471 S.W.2d 430 (Tex.Civ.App.— Tyler 1971, no writ).

In the case before us, the testimony of two doctors was obtained by way of written interrogatories. These interrogatories, together with the doctors' answers thereto, were received into evidence.

■ It is well-established that a physician's opinion testimony must be based

upon "reasonable medical probability", as opposed to a mere "possibility", in that almost anything is "possible" in the field of medicine. *Otis Elevator Company v. Wood*, 436 S.W.2d 324, 331 (Tex.1968). By the written interrogatories to the two doctors, the plaintiff's attorney carefully instructed the doctors to base their opinions upon reasonable medical probability.

Thomas Hunter Smith, M. D., who specializes in ophthalmology, was one of the two medical doctors who gave testimony on the issue of "irrecoverability". The crucial portion of his testimony was as follows:

"We discussed a corneal transplant with Mr. Boone and he was not sure that he was interested. We explained the risk of infection, graft rejection, secondary glaucoma, retinal detachment, death from general anesthesia, and all possible complications of this surgery, and he said that he would consider this and discuss it with his family and let us know if he desired to pursue this, and we have not heard from Mr. Boone since.

"At that time, we did not feel that any additional medication or other medical treatment was efficacious at that time and the only possibility of rehabilitation would be with the surgical procedure."

N. Thomas O'Keefe, M. D., another medical doctor specializing in ophthalmology, elaborated on the sophisticated surgical procedure known as a corneal transplant. A portion of his testimony was as follows:

"I feel that he should be evaluated by an opthalmologist (sic) who does corneal transplants to see if his vision could not be improved by removing the scar from the left cornea and having a clear corneal transplant."

.     .     .     .     .

"The procedure is the corneal transplant. The ultimate visual ability would be determined after an adequate healing period, and really is not predictable.

"I think the chances are greater than fifty-fifty in his favor of improving his vision; however, this opinion would best come from someone who is going to do the procedure."

The plaintiff in this case has lost his sight. At best, the evidence indicates the mere possibility of a successful corneal transplant. The following considerations (among others) are important in determining the feasibility of a corneal transplant:

"If the history and cause of death of the prospective donor are acceptable, the surgeon must then consider the age of the donor in relation to the age of recipient. If the recipient is a young person, then the donor should not be an aged person. The closer in age the better. The age span for donors can generally be listed as ten years to sixty years." 6 *Lawyers' Medical Cyclopedia* § 39.27 at 54 (1977).

.     .     .     .     .

"Anyone over eighteen years of age can pledge to become a donor. A form is filled out and signed by two witnesses, and returned to the nearest eye bank. The donor gets a card and a small orange sticker for his driver's license.

"Morticians in several states have been and are continuing to be trained in the technique of removing the eyes of a deceased, so that they may be used to restore the sight of the blind. The eyes should be removed within four hours of death. The transplant of a fresh cornea should be done within 24 to 36 hours. The sooner the transplant is done, the better the condition of the graft. Some corneas, however, are frozen and stored for use at a later date." *Id.* § 39.28 at 55.

■ Plaintiff argues that even if a successful corneal transplant were performed, he would nevertheless be entitled to recover under the terms of the insurance policy, since he would no longer have his sight, but would be "seeing" out of someone else's eye. We agree. Although there is no Texas case directly on this point, we are guided by the well-written opinion by the Supreme Court of Utah in *Knuckles v. Metropolitan Life Insurance Company*, 25 Utah 2d 319, 480 P.2d 745 (Utah 1971), where the court wrote:

"It would seem that it would not be unreasonable to conclude that the purpose

of the insurance was to compensate for a hand or a foot *or a sight once lost,*—albeit the sight, like the hand, artificially may be made serviceable. Some people might interpret the language of the dismemberment clause that way,—and they that did surely would not expect, as the defendant contends in argument, that after suffering blindness through accident, he would have to seek out surgery and medication. If he must do this, his costs, of course, may be twice the face amount of the policy at present-day medical prices,—before he would be entitled to any benefits under the policy. We believe that once the sight is completely destroyed, as was the case here, a person should not be required, at his own expense, to test the possibility of recovering his sight any more than the person, who in the same paragraph of the policy would not be required to do if he lost his hand or foot. . . ." *Id.* at 747.

Having carefully considered all the competent evidence received by the trial court, we must conclude that the trial court's finding that the plaintiff's loss of sight was not irrecoverable is so against the great weight and preponderance of the evidence as to be manifestly unjust.

By his third point of error, plaintiff contends that the "finding of the trial court that a reasonably prudent person under the same or similar circumstances, would have submitted to proper medical and surgical treatment to seek recovery of the loss of sight is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust."

In reviewing the entire evidence, we consider the answers to interrogatories given by Dr. Thomas Hunter Smith to be particularly important. His testimony has been previously set forth in part in this opinion. To reiterate without being unduly repetitious, he testified as to the "risk of infection, graft rejection, secondary glaucoma, retinal detachment, death from general anesthesia, and all possible complications of this surgery . . . ."

Having reviewed all the evidence received by the trial court, we sustain the plaintiff's third point of error.

Reversed and remanded.