**Cecil Ray ARNOLD,**
**Plaintiff–Appellant,**

v.

**LIFE INSURANCE COMPANY OF**
**NORTH AMERICA,**
**Defendant–Appellee.**

No. 89–8374.

United States Court of Appeals,
Eleventh Circuit.

March 1, 1990.

Richard D. Phillips, Ludowici, Ga., for plaintiff-appellant.

James B. Durham, Fendig, McLemore, Taylor & Whitworth, Brunswick, Ga., for defendant-appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal from the dismissal by the trial court of appellant Arnold's complaint in which he had alleged defendant Life Insurance Company of North America had refused to pay for the loss of plaintiff's sight in one eye.

## I. STATEMENT OF THE CASE

The insurance policy in question was provided to the plaintiff by his employer under an employee welfare benefit plan. His claim, therefore, fell within the purview of the Employee Retirement Insurance Security Act, 29 U.S.C. § 1001 *et seq.* (ERISA). The plan administrator ruled that the plaintiff was not entitled to benefits under ERISA because, as he held, plaintiff did not meet the definition of "entire and irrecoverable loss of sight" under the policy. The petitioner then sought review in the district court. The court, considering the matter *de novo*, affirmed the decision of

the plan administrator and held that the plaintiff was not entitled to recover.

## II. STATEMENT OF FACTS

The facts are not disputed. The plaintiff suffered an injury to his eye while on the job. He had surgery in an effort to correct the vision which, uncorrected, gave him a vision represented by 20/400 but, by the use of corrective lenses was 20/50 minus one. The undisputed evidence was that appellant could see well enough by the use of a corrective lens for his injured eye, to permit him to perform his usual duties.

The policy provision upon which plaintiff relied reads as follows:

> *Coverage A—Loss of Life, Limb or Sight Indemnity.* If such injuries shall result in any one of the following specific losses within one year from the date of accident, the Company will pay the benefit specified as applicable thereto, based upon the Principal Sum stated in the Policy Schedule; ... Loss of one member ... One–Half The Principal Sum. "Member" means hand, foot or eye. "Loss" means, with regard to hand or foot, actual severance through or above the wrist or ankle joints; with regard to eye, *entire and irrecoverable loss of sight.*

## III. ISSUES ON APPEAL

1. By what legal standard is the language of this contract to be construed?
2. Did the trial court err in its construction of the contract under such proper standard?

## IV. DISCUSSION

The parties are in agreement that the Supreme Court's decision in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), prescribes the law that federal courts are to apply in ERISA actions. The federal courts are to develop a "federal common law of rights and obligations under ERISA-regulated plans," 109 S.Ct. at 954, citing *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41 at 56, 107 S.Ct. 1549 at 1558, 95 L.Ed.2d 39 (1987). The Court also referred to *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 24 n. 26, 103 S.Ct. 2841, 2854 n. 26, 77 L.Ed.2d 420 (1983) (" 'a body of federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans.' ").

■ We agree with the trial court that this does not mean that the federal courts attempt merely to decide what a majority of state courts have done in their interpretations of an insurance policy provision to establish the federal common law. Federal common law is that law fashioned by the federal courts through their interpretation of policy language and is not based upon any calculation of the majority of decisions from other jurisdictions.

### A. *Standard of Review*

The appellee here contends that the district court's review of the decision by the plan administrator should have been on a deferential basis rather than *de novo*. In other words, appellee claims that the court should not set aside the administrator's decision unless it was "arbitrary and capricious"; *see generally, Firestone, supra*, 109 S.Ct. at 953.

We conclude that it is not necessary for us to determine which standard of review should be applied here, because under either standard the federal common law requires us to give effect to the unambiguous language of the policy when construed in accordance with its terms.

### B. *Meaning of the Policy*

■ It is clear that the terms of this contract respecting Coverage A, under which plaintiff claims, clearly and unambiguously deal with the "entire and irrecoverable loss of sight." This is first made clear by the first line in Coverage A, which is: "Loss of life, limb or *sight indemnity.*" This language indicates that any loss of sight was considered differently from a loss of life or a loss of limb, especially since in the further provision of Coverage A, it is

clear that the policy protected against a complete loss of the *hand* or *foot* but with respect to the *eye,* it "means ... with regard to eye, *entire and irrecoverable loss of sight.*" It did not state "irrecoverable injury to eye."

While the eye may have been irrecoverably damaged, the sight clearly was not. The evidence is undisputed that with corrective lenses, the sight was substantially normal.

We conclude, therefore, that there is only one construction that can be made of this provision, and that construction requires that we find that the trial court did not err in dismissing the plaintiff's complaint.

We recognize that there are state court decisions holding similar contract terms in the manner contended for by the plaintiff, but there are also state court opinions, holding as we do, including the Georgia case involving this same plaintiff, claiming under a different insurance policy, *Arnold v. Equitable Life Assurance Society of the U.S.,* 189 Ga.App. 66, 374 S.E.2d 782 (1988), citing *Smith v. Great American Life Insurance Co.,* 125 Ga.App. 587, 188 S.E.2d 439 (1972).

## V. CONCLUSION

The judgment of the trial court is therefore AFFIRMED.

JOHNSON, Circuit Judge, dissenting:

Because I cannot agree with the Court's approach to interpreting the insurance policy at issue in this case, and because I ultimately reach a different conclusion as to its meaning, I respectfully dissent.

## I. STANDARD OF REVIEW

It is clear that if deferential "arbitrary and capricious" review were applied to the plan administrator's decision to deny benefits in this case, we would be obliged to uphold that decision. I have no doubt that the plan administrator's interpretation of the policy is rationally supportable. As discussed below in Part II, however, my *de*

*novo* interpretation of the policy leads me to the opposite conclusion. Therefore, while the majority is able to avoid deciding what level of scrutiny must be applied to the plan administrator's decision,[1] I must necessarily resolve that question at the outset.

The answer is straightforward. Under *Firestone Tire & Rubber Co. v. Bruch,* —— U.S. ——, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989), a denial of benefits under an ERISA-governed plan "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Applying *Firestone,* this Court has held that the administrator's decisions and interpretations "must be reviewed *de novo* unless the plan *expressly* gives the administrator discretionary authority to make eligibility determinations or to construe the plan's terms"; otherwise, "application of the more deferential arbitrary and capricious standard is appropriate." *Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37, 38–39 (11th Cir.1989) (emphasis added). The only language in the present policy to which appellee, the Life Insurance Company of North America ("the Company"), can point in support of such discretionary authority is the statement that "[a]fter your claim has been processed, you will be notified in writing if any benefits are denied in whole or in part." This language does not even refer to the plan administrator and says nothing about the deference to be accorded to his decisions. It merely describes the initial procedure for claim determination. It thus fails to meet the standard cited above. *Cf. Jett v. Blue Cross and Blue Shield of Alabama,* 890 F.2d 1137, 1139 (11th Cir. 1989) (discretionary authority found where plan stated that "whenever the Claims Administrator makes reasonable determinations ... such determinations shall be final and conclusive" and that "Blue Cross ... has the exclusive right to interpret [the plan], so its decision is conclusive and binding"). The district court therefore correct-

---

1. The majority, for purposes of its analysis, in  fact applies a *de novo* standard.

ly applied *de novo* review to the meaning of the policy in this case and this Court in turn is obligated to conduct *de novo* review.[2]

## II. THE MEANING OF THE POLICY

### A. *The Proper Measure of Post–Accident Vision*

The majority's brief discussion of the policy's meaning proceeds from the premise that the policy language is unambiguous and can bear only one construction. I am at a loss to understand this approach. The majority finds informative the fact that the relevant policy heading refers to "[l]oss of life, limb or *sight indemnity*" (emphasis supplied by the Court) and that the policy refers to "entire and irrecoverable loss of sight" rather than "irrecoverable injury to eye." These observations, however, beg the question.[3] It is of no moment that the policy deals with loss of the ability to see, rather than loss of the eye as a physical organ. Appellant Arnold has never claimed or suggested otherwise. Nor, as the Court notes, has Arnold ever disputed that with corrective lenses his sight in his right eye is restorable to a more or less functional level.

The key issue in this case is what interpretation should be placed on the terms "sight" and "entire and irrecoverable loss." In particular, the issue is whether the policy requires a comparison of Arnold's *corrected* or *uncorrected* post-accident vision with his 20/20 uncorrected pre-accident vision. This is the issue to which the parties devote the bulk of their argument on appeal. The majority apparently does not deem this question worthy of any significant analysis, other than to note that state court decisions exist supporting both approaches, and to assert, in a conclusory

manner, that "[w]hile [Arnold's] eye may have been irrecoverably damaged, [his] sight clearly was not." Unlike the majority, I do not find it self-evident that "sight" refers to the functional level of vision which a person may achieve through the use of artificial aids or devices, as opposed to the eye's natural, unaided vision. Nor can I discern from the bare language of the policy whether "irrecoverable" refers to "recovery" through corrective lenses and devices external to the eye, or "recovery" in the sense of the eye regaining its own full natural function, whether through medical treatment or the body's own healing processes. In sum, I find that the language of this policy, viewed in isolation, simply does not contain the answer to the question posed by this case. *Cf.* Appleman's Insurance Law and Practice § 7386, at 159–61 (1976) (an insurance policy is ambiguous "when it contains language which may be interpreted more than one way and there is nothing to indicate which meaning is intended").

As the Court notes, we are required under the *Firestone* decision to apply federal common law in interpreting ERISA–governed plans. I agree that we are not to mechanically follow what a majority of state courts have done in this area. I find no clear weight of precedent on this question in any event. Our task, as this and other circuits have defined it, is to rely on state-law sources where relevant and inherently persuasive, while always keeping in mind the underlying policies of the federal statutory scheme with which we are dealing. *See, e.g., Nachwalter v. Christie,* 805 F.2d 956, 959–60 (11th Cir.1986); *Scott v. Gulf Oil Corp.,* 754 F.2d 1499, 1501–02 (9th Cir.1985). This Court has held that "[a] central policy goal of ERISA is to protect the interests of employees and their benefi-

---

2. The district court's interpretation of the policy in this case was based solely upon the policy language, and not upon any extrinsic evidence of the actual intent of the contracting parties. Therefore, under traditional contract principles, the interpretation of the policy is a question of law subject to *de novo* review. *See Brewer v. Muscle Shoals Board of Education,* 790 F.2d 1515, 1519 (11th Cir.1986).

3. I find especially perplexing the majority's focus on the policy heading. It seems quite obvious that the word "indemnity" was not intended to have any particular association with the term "sight," but rather that the heading might just as well have been phrased "indemnity for loss of life, limb or sight." After all, the purpose of the policy is to "indemnify" the insured for any of the specified losses.

ciaries in employee benefit plans." *Nachwalter*, 805 F.2d at 960; *accord Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). "Congress wanted to assure that those who participate in [ERISA–governed] plans actually receive the benefits they are entitled to and do not lose these as a result of unduly restrictive provisions or lack of sufficient funds." *Helms v. Monsanto Co.*, 728 F.2d 1416, 1420 (11th Cir.1984).

As noted above, this issue cannot be settled by resort to a scorecard of state court decisions. Different courts, some even within the same jurisdiction,[4] have come to sharply differing conclusions.[5] It suffices for me to note that I find more persuasive those courts and judges which have resolved the issue in favor of Arnold's approach. The Utah Supreme Court, for example, in upholding a claim under a loss-of-sight policy by a claimant whose vision was substantially correctable by artificial lenses, noted that the insurance company in that case did not dispute—as, indeed, few would—"that the loss of a hand would be compensable, though a prosthetic might serve as well or conceivably better." *Knuckles v. Metropolitan Life Ins. Co.*, 25 Utah 2d 319, 480 P.2d 745, 747 (1971). "[T]he purpose of the insurance was to compensate for a hand or a foot or a sight once lost,—albeit the sight, like the hand, artificially may be made serviceable." *Id.* As the Chief Justice of Missouri has noted: "One sees with his eyes, not with glasses, and the ability to see without glasses is an extremely valuable asset. It allows people to do many things that are difficult, if not

impossible, if they are required to wear glasses, whether they be contacts or conventional glasses." *Crim v. National Life and Accident Ins. Co.*, 605 S.W.2d 73, 78 (Mo.1980) (4–3 decision) (Bardgett, C.J., dissenting).

Ultimately, the decisive factor persuading me in favor of Arnold's approach is the well-established canon of interpretation that insurance policies, where ambiguous or subject to dispute, should be strictly construed against the insurance company and liberally in favor of the insured. *See* Appleman's Insurance Law and Practice § 7401 (1976 & Supp.1989) (citing numerous cases); *accord, e.g., Parfait v. Central Towing, Inc.*, 660 F.2d 608, 610 (5th Cir. 1981) (Brown, J.), *clarified in nonrelevant part*, 667 F.2d 1189 (5th Cir.1982); *Howard v. Federal Crop Ins. Corp.*, 540 F.2d 695, 697 (4th Cir.1976); *United States Fire Ins. Co. v. McCormick*, 286 Ala. 531, 243 So.2d 367, 372 (1970); *Winegarden v. Peninsular Life Ins. Co.*, 363 So.2d 1172, 1173 (Fla.App.1978), *cert. denied*, 370 So.2d 461 (Fla.1979); *Welch v. Professional Ins. Corp.*, 140 Ga.App. 336, 231 S.E.2d 103, 104 (1976). There is no doubt that resort to this principle of liberal construction is appropriate in view of the underlying beneficial goals and policies of ERISA noted above.

In sum, while reasonable arguments exist on both sides, I believe that this issue of first impression in this Circuit should be resolved in favor of Arnold. The fact that Arnold may now be able to see passably well from his right eye with the aid of glasses cannot obscure the fact that he has

---

**4.** *Compare Georgia Cas. & Sur. Co. v. Speller*, 122 Ga.App. 459, 177 S.E.2d 491, 492–93 (1970) (favoring Arnold's approach) *with Smith v. Great American Life Ins. Co.*, 125 Ga.App. 587, 188 S.E.2d 439, 440 (1972) (favoring the Company's approach). As the Court notes, a Georgia court recently rejected Arnold's approach in a claim brought by Arnold himself on the basis of the very same injury involved in the present case, under a different, non–ERISA–governed insurance policy. *See Arnold v. Equitable Life Assurance Society*, 189 Ga.App. 66, 374 S.E.2d 782 (1988) (following *Smith*), *cert. denied*, 374 S.E.2d 782 (Ga.1989). This holding, however, is no more binding on us than is any state court decision involving this issue.

**5.** *Compare, e.g., Knuckles v. Metropolitan Life Ins. Co.*, 25 Utah 2d 319, 480 P.2d 745, 748 (1971); *Winegarden v. Peninsular Life Ins. Co.*, 363 So.2d 1172, 1173 (Fla.App.1978), *cert. denied*, 370 So.2d 461 (Fla.1979); *Boone v. United Founders Life Ins. Co.*, 565 S.W.2d 380, 382–83 (Tex.Civ.App.1978); *Hohn v. Nationwide Ins. Cos.*, 311 Pa.Super. 227, 457 A.2d 858, 860–61 (1982) (all favoring Arnold's approach) *with Crim v. National Life and Accident Ins. Co.*, 605 S.W.2d 73, 77 (Mo.1980); *Wallace v. Insurance Co. of North America*, 415 F.2d 542, 544–45 (6th Cir.1969) (applying Kentucky law); *Home Life Ins. Co. v. Stewart*, 114 F.2d 516, 518–19 (10th Cir.1940) (applying Colorado law) (all favoring the Company's approach).

lost his pre-existing perfect natural vision in that eye. This loss is real and palpable and Arnold's expectation that his insurance policy should compensate him for it is entirely reasonable. As one Florida District Court of Appeal has observed with regard to an identically worded insurance policy, "by the appropriate policy language, [the insurer] could avoid this result if it so desired." *Winegarden*, 363 So.2d at 1173. The Company not having so carefully phrased its policy, the ambiguity should be resolved against it.

### B. *The Meaning of "Entire" Vision Loss*

The remaining issue in this case, once it is settled whether corrected or uncorrected post-accident vision is the relevant yardstick, is the definition of "entire" vision loss. The majority, of course, does not reach this issue because Arnold concedes that if *corrected* post-accident vision is the proper measure, then he has not suffered an "entire" loss of sight. My resolution of the former issue, however, requires that I reach the latter. The Georgia Supreme Court has held that total blindness, rather than "loss of sight for all practical purposes," is the appropriate standard under an insurance policy referring to "entire" loss. *State Farm Mutual Auto. Ins. Co. v. Sewell*, 223 Ga. 31, 153 S.E.2d 432, 433 (1967). *Sewell* held that the "word 'entire' embraces all and leaves nothing.... [I]f there exists enough sight to count fingers, see that a shirt is blue, and see objects though indistinctly ... sight is not entirely lost." *Id.* Under this standard, Arnold's uncorrected post-accident vision of 20/400 (96.7% vision loss) might fail to qualify as an "entire" loss of sight. The Michigan Supreme Court, however, has held that policy language referring to "total and irrecoverable loss" or "entire and irrecoverable loss" should be construed to refer to whether a claimant's "eye is or can be of any practical use or benefit to the insured."

*Lewis v. Metropolitan Life Ins. Co.*, 397 Mich. 481, 245 N.W.2d 9, 11 (1976); *accord Massachusetts Indem. & Life Ins. Co. v. Schupper*, 301 So.2d 789, 791 (Fla.App. 1974), *cert. denied*, 312 So.2d 743 (Fla.1975) (policies referring to "entire loss of sight" or "total blindness" should be "interpreted to mean loss of practical use of sight rather than literal blindness"). In view of the principles of insurance policy construction and the goals underlying ERISA discussed above, the latter approach is clearly preferable to the harsh standard of the Georgia court.[6] Because Arnold's uncorrected vision falls well below the 20/200 level commonly used by ophthalmologists as the benchmark for functional or practical blindness,[7] there appears to be little doubt that he has suffered an "entire" loss of vision in his right eye under the appropriate standard.

### III. CONCLUSION

For the foregoing reasons, I would reverse the district court's denial of Arnold's claim for benefits in this case.

---

**6.** It appears that the Company may even have conceded this particular issue to Arnold, because it argues in its brief that "to determine if sight is irrecoverably lost, practical and/or beneficial use is the proper standard."

**7.** This medical standard was established by the testimony of Arnold's ophthalmologist in this case and does not appear to be disputed by the Company.