### Lila WILLIAMS Plaintiff

v.

### BOARD OF TRUSTEES OF the INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO Employers Pension Fund, Southeast Florida Ports Defendant

#### No. 03–21082–CIV.

United States District Court, S.D. Florida, Miami Division.

Sept. 15, 2005.

Keith M. Stern, Esq., Shavitz Law Group, Boca Raton, FL, for Plaintiff.

Neil Flaxman, Esq., Coral Gables, FL, for Defendants.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

JORDAN, District Judge.

The question in this case, brought under the civil enforcement provision of ERISA, 29 U.S.C. § 1132(a)(1)(B), is whether Lila Williams, the former wife of Elijah Williams, Jr. is entitled, under the Employers Pension Fund (the "Pension Fund" or "Plan") of the International Longshoremen's Association (the "ILA"), to receive a monthly single death benefit of $2,695.00 for the five-year period from August 23, 2002, to August 22, 2007, in addition to her normal QDRO ("Qualified Domestic Relations Order") monthly benefit of $755.00. As explained below, I conclude that she is not.

**I. FINDINGS OF FACT**

The ILA Pension Fund, also referred to as the Plan, is a multi-employer pension

benefit plan with 1,100 active members and 750 retired members. It is governed by ERISA, 29 U.S.C. § 1001 et seq.

From 1972 until his death on August 23, 2002, Elijah Williams, Jr. belonged to and was an active member of the ILA. He worked as a "checker" in Miami.

When he died, Mr. Williams had not begun receiving any benefits under the Plan, but was vested in two types of pensions under the Plan: defined contribution and defined benefit. Unlike the defined contribution portion, the defined benefit portion was paid solely by the employer, and was based on a formula that included, among other factors, years of service and number of compensated work hours.[1]

Mr. Williams married Lila Williams on November 15, 1974. Mrs. Williams was the named beneficiary of Mr. Williams for the ILA defined contribution portion, and it is undisputed that she received a lump sum from the Pension Fund representing her entitlement to Mr. Williams' interests, as well as the proceeds of Mr. Williams' life insurance policy. Mrs. Williams, however, was not the named beneficiary of Mr. Williams for the ILA defined benefit portion, as Mr. Williams never filled out a separate designation of beneficiary form.

## A. THE MARRIAGE AND DISSOLUTION

Mr. and Mrs. Williams did not have any children. They remained married until November 3, 1997, when their marriage was dissolved by a final judgment of a Florida state court. Lovester Montgomery, an assistant manager for the Pension Fund, was present at some of the dissolution proceedings at the request of Mrs. Williams and her divorce attorney. In its final judgment, the state court adopted the report and recommendations of a general master, and retained jurisdiction to en-force the recommendations set forth in the general master's report.

Among other things, Mrs. Williams was awarded a lump-sum award of $3,649.92 as equitable distribution from an annuity Mr. Williams had, as well as permanent periodic alimony of $400.00 per week (for the duration of her life or until she remarried or until Mr. Williams died). Mr. Williams, who stayed in contact with Mrs. Williams after the divorce, made the lump-sum payment and also made the weekly alimony payments (whether by payroll deduction or direct payment).

At the time of the final judgment of dissolution, Mr. Williams was 49 years old and worked as a checker at the Port of Miami, earning a yearly gross income of $85,000.00. Mrs. Williams was 54 years old and worked as a housekeeper at the Miami Veterans Hospital, earning a net yearly income of $10,000.00.

Following the divorce, Mrs. Williams remained the exclusive designated beneficiary on Mr. Williams' two life insurance policies. One of the policies, with a face value of $20,000.00, was through the ILA. The other, with a face value of $10,000.00, was a veteran's policy.

## B. THE SUBSEQUENT QDRO

On February 10, 1999, the state court issued a Qualified Domestic Relations Order ("QDRO") in favor of Mrs. Williams to "recognize[ ] the existence of the right of [Mrs. Williams] to receive a portion of the retirement, death, and other benefits payable to or in respect of [Mr. Williams]." The state court wrote that it intended its order to be a QDRO "within the meaning of section 414(p) of the Internal Revenue Code of 1986." The QDRO expressly applied to the ILA's Plan, and awarded Mrs.

---

1. ILA members could also participate in welfare benefit plans (e.g., medical, dental, and health insurance plans) that are not at issue here.

Williams 46% of Mr. Williams' "Accrued Benefit" under the Plan. The QDRO also indicated, however, that it "does not require the Plan to provide any type or form of benefit, or any option, not otherwise provided under the Plan," and "does not require the Plan to provide any increased benefits (determined on the basis of actuarial value)." The QDRO further stated that if Mr. Williams died "before becoming eligible for normal retirement and on or before the commencement of payment to [Mrs. Williams] of her Accrued Benefit, then the payment shall not be limited so as to exclude the value of any employer subsidy(ies) for early retirement."

Mrs. Williams' divorce attorney sent a copy of the QDRO to the Pension Fund in late October of 1997.

### C. PAYMENTS MADE BY THE PENSION FUND UPON MR. WILLIAMS' DEATH

As noted earlier, Mr. Williams died on August 23, 2002. The Pension Fund, pursuant to the QDRO, has paid Mrs. Williams $755.00 per month since then, and will continue to pay her that amount until her death. As required by the QDRO, the sum of $755.00 is 46% of Mr. Williams' Accrued Benefit under the defined contribution portion of the Plan. The Pension Fund also paid Mrs. Williams $20,000.00 under Mr. Williams' ILA insurance policy, $3,000.00 in holiday benefits, $4,000.00 in vacation benefits, $4,000.00 for a container Mr. Williams had worked on, and $16,000.00 in retirement benefits.[2]

### D. THE SINGLE DEATH BENEFIT UNDER SECTION 2.07 OF THE PLAN

The dispute in this case concerns the single death benefit under the Plan, which became effective in October of 1994 and is 101 pages long. At all relevant times, Mrs. Williams was the named beneficiary of Mr. Williams under the defined contri-

bution portion. Mr. Williams, however, did not separately designate Mrs. Williams as his named beneficiary under the defined benefit portion, which covers the single death benefit.

The single death benefit was added to the Plan effective October 1, 1996. It provides as follows:

**2.07 Unmarried Employee's Death Benefit.** Upon the death of an active Employee:

(a) who is unmarried at the time of his death *and who leaves no former Spouse appointed as his surviving Spouse under the terms of a Qualified Domestic Relations Order,* and

(b) who has completed at least:

(1) 10 years of Credited Service and 10,000 Compensated Hours, or

(2) 5 years of Credited Service and 4,350 Compensated Hours, at least one of which Compensated Hours is completed after September 30, 1997,

an immediate monthly death benefit shall be paid to the Employee's *beneficiary designated on a form prepared for that purpose.* The amount of the monthly benefit shall equal the monthly benefit the Employee would have been eligible to receive had his date of death been his Normal Retirement Date, based upon his Credited Service and Compensated Hours at death. The monthly benefit shall be paid for 5 years or until the beneficiary dies, if earlier. *If the Employee fails to designate a beneficiary, no death benefit shall be paid.*

(emphasis added).

The specific form for designating a beneficiary for the single death benefit was created in September of 1997. This form was entitled "ILA Pension Survivor Benefit Election Form." Nowhere on the form,

---

**2.** Mrs. Williams does not challenge the Pen-      sion Fund's payment of these amounts.

however, did the ILA advise participants that this was a new form that had to be used for the single death benefit.

On July 26, 1999—about four months after the issuance of the QDRO by the state court—the manager of the Pension Fund wrote a letter entitled "REMINDER" to the Plan's active participants (i.e., non-retirees). The letter stated: "The consequence of not naming a beneficiary for the defined benefit plan is severe if you are single because if you fail to name a beneficiary, NO pension will be paid after your death." This letter, however, did not tell participants that the new form had to be used.

### E. OTHER RELEVANT PROVISIONS OF THE PLAN

Other relevant provisions of the Plan are as follows:

**3.09 Form of Payment of Retirement Pension.**

(a) Normal Form of Pension. The normal form of retirement pension payable under this Plan shall be an income payable monthly for the life of the Employee in an amount determined as provided in this Article 3 thereof and subject to all of the provisions and conditions of this plan.

(1) This monthly life income is the Qualified Joint and Survivor Pension for an Employee who is not married on his Annuity Starting Date.

(2) The normal form of Retirement Pension payable of the Retirement Pension in the case of an Employee who is married on his Annuity Starting Date shall be a Qualified Joint and Survivor Pension under which the surviving spouse shall receive 50% of the amount of the Employee's Retirement Pension for each month for such Spouse's lifetime after the death of the Employee. The Spouse's benefit shall commence the

first day of the month following the month in which the employee dies.

(3) The Qualified Joint and Survivor Pension shall become effective upon Normal Retirement Date or earlier actual retirement.

(4) The Employee may elect to receive in lieu of the Qualified Joint and Survivor Pension described in this Section 3.09(a), the Level Income form of Retirement Pension described in Section 3.09(b) below.

(B) Level Income Option. An Employee whose Early Retirement Pension or Deferred Vested Pension payments commence prior to Normal Retirement Age and whose monthly pension payments would exceed the expected monthly benefit payable from Social Security at age 62 may elect to have monthly pension payments under this Plan adjusted to coordinate with Social Security retirement benefits so that the total monthly payments from both the Plan and Social Security will remain approximately equal before an after Normal Retirement Age, when Social Security benefits commence.... These Level Income payments will be the Actuarial Equivalent of the normal form of retirement pension described in Section 3.09(a). The benefits payable from the Plan under the Level Income Option will be greater before Normal Retirement Age and will be reduced after Normal Retirement Age when Social Security benefits begin.

In the event the level income option is selected, and the Pensioner dies after the Annuity starting date, the Pensioner's spouse shall receive the benefit described in Section 3.06(f).

**3.15 Survivor Benefits After Divorce.**

(a) If an Employee and spouse are divorced prior to the Annuity Starting Date, any elections made or in effect

while the Employee was married to his former Spouse remain valid unless

(1) otherwise provided in a Qualified Domestic Relations Order,

(2) the Employee changes them and is not precluded from doing so by a Qualified Domestic Relations Order, or

(3) the Employee is remarried to a different Spouse.

Notwithstanding anything to the contrary, upon the Employer's remarriage to a different Spouse, the Employee's former Spouse no longer shall be considered the Employee's Spouse for any purpose under the Plan, unless a Qualified Domestic Relations Order specifies otherwise, as in section 414(p)(5) of the Code.

(b) If a Pensioner and Spouse are divorced after the Annuity Starting Date, the Spouse to whom the Pensioner was married on the Annuity Starting Date is entitled to the 50% Qualified Joint and Survivor Pension after the Pensioner's death as provided in Section 3.09(a)(2), based upon accruals to that Annuity Starting Date, unless

(1) waived and consented to by such Spouse, or

(2) a Qualified Domestic Relations Order provides otherwise.

(c) Regardless of whether divorce occurs before or after the Annuity Starting Date, no accruals after the date of divorce shall inure to the benefit of the former Spouse unless

(1) the Employee or Pensioner consents in writing, or

(2) a Qualified Domestic Relations Order so directs.

(d) Notwithstanding anything to the contrary, the combined actuarial values of all benefits paid to a Pensioner and his Spouse, former Spouses, and all other beneficiaries under the Plan shall not exceed the actuarial value of the Pensioner's vested accrued benefit.

## F. THE SPD AND EVENTS FOLLOWING MR. WILLIAMS' DEATH

A day or two after Mr. Williams' death, Mrs. Williams went with her friend Pat Quinn to clean out Mr. Williams' apartment. They found a 32–page Summary Plan Description ("SPD"), dated July 1, 2001, for the ILA's Plan in the apartment, and began to look through it. On pages 18 and 19, the SPD provided as follows:

**Death Benefits If You Are Single**

If:

● You are not married when your pension begins, and

● You do not live long enough to receive 60 pension payments,

then *the beneficiary you name on your pension application* will receive pension payments for the remainder of the 60 month period. You may name only one beneficiary, and no death benefits will be paid after that beneficiary dies. If you name more than one beneficiary, the first person named will be considered the primary beneficiary.

If you die before you leave employment in the industry, are unmarried, and have earned 5 years of credited service and 4,350 compensated hours, your designated beneficiary (if any) will receive an immediate monthly pension equal to the pension you would have been able to receive at age 62, had you retired on the date of your death. This pension will be paid for five years or until the beneficiary dies, if earlier. *If you fail to designate a beneficiary, no pension will be paid after your death.*

*For more information about this pension, see Sections 2.07 and 3.09(a)(1) of the Plan document.*

**Domestic Relations Orders**

Usually, your pension may not be assigned to anyone else. This means that your interest in the Plan may not be

sold, used as collateral for a loan, given away, or transferred. In addition, your creditors (other than the IRS, of course) may not attach, garnish, or interfere with your pension.

There is an exception, however, to this rule. The Plan must honor a qualified domestic relations order (QDRO), which is a decree or order issued by a court, that obligates you to pay child support or alimony, or allocates a portion of your pension to your spouse, former spouse, child, or other dependent. If the Board of Trustees receives a QDRO, all or a portion of your pension may be used to satisfy the obligation. The Board will determine the validity of any domestic relations order served upon the Plan. Any dispute over a domestic relations order will be resolved through the Plan's appeal procedure described on page 24. *For more information about domestic relations orders, see Sections 5.22–5.24 of the Plan document.*

(emphasis added to phrase beginning "the beneficiary you name . . ." and to sentence beginning "If you fail to designate a beneficiary . . . .").

After reading these pages of the SPD, Mrs. Williams believed that she was entitled to the single death benefit. She did not read anything else, including the relevant pages of the Plan, because in her mind she had no need to do so.

**The First Meeting.** On Monday, August 26, 2002, Mrs. Williams and Ms. Quinn went to the Pension Fund's office in Miami to check on Mrs. Williams' status under the Plan. Mr. Montgomery, the Pension Fund's assistant manager, told Mrs. Williams that Mr. Williams had "left her taken care of" and that she had nothing to worry about. Mr. Montgomery did not say anything about Mr. Williams having failed to fill out any form, and the subject of the QDRO did not come up. During the visit, Edwin Stewart, the Pension Fund's manager (and administrative benefits and records custodian) since 1991,[3] looked at the computer records and said "nothing's been updated" and "I guess she's the beneficiary." When Mr. Stewart said that there was no QDRO in the file, Mrs. Williams gave Mr. Montgomery or Mr. Stewart a copy of the QDRO. Mr. Stewart made another copy of the QDRO and placed it in Mr. Williams' file. Neither Mr. Montgomery nor Mr. Stewart said at the time that Mrs. Williams could not get the single death benefit (either because of the QDRO or the failure to designate a beneficiary). Nor did they tell Mrs. Williams that she would receive that benefit.

**The Second Meeting.** Two days later, on August 28, 2002, Mrs. Williams returned to the Pension Fund's office to pick up a pension check. After waiting for about five hours, she received a check for $755.00.[4] Mrs. Williams told Sheryl Milton (Mr. Stewart's assistant) that she was supposed to get $2,695.00, but nevertheless took the check for $755.00 with her. When she and Ms. Quinn later called Mr. Montgomery to talk to him about the SPD, Mr. Montgomery said he was too busy to speak to them.

---

3. Mr. Stewart is the Pension Fund's highest-ranking employee and reports directly to the Board of Trustees. The Board, made up of 14 members (seven employer trustees and seven union trustees), is the Plan administrator and makes the final decisions concerning benefits under the Plan. In the event of a tie vote or deadlock, a neutral third party casts the deciding vote.

4. Benefits usually begin 30 days after a participant's death. Mrs. Williams had to wait several hours because she wanted the benefits to be paid immediately (i.e., just days after Mr. Williams' death).

**The Third Meeting.** The following day, August 29, 2002, Mrs. Williams and Ms. Quinn again visited the Pension Fund's office, this time with the SPD in hand. Mr. Stewart told Mrs. Williams that Mr. Williams was a married man under the QDRO, so he was going by the QDRO, and they would give her a better deal under the QDRO because the payments under the QDRO were for life. Mrs. Williams and Mr. Stewart discussed the single death benefit, with Mrs. Williams bringing up the sum of $2,695.00.[5] Mr. Stewart never showed Mrs. Williams the actual Plan document, but he did read to her Section 2.07 of the Plan. Mrs. Williams was not interested in what the Plan said, and kept relying on page 18 of the SPD. Ms. Quinn advised Mrs. Williams to obtain an attorney.

In September of 2002, Mrs. Williams made up her mind to retire from the Veterans Administration. Her last actual day of work was October 31, 2002. Mrs. Williams then took two months of leave time she had accrued.

In early November of 2002, Mrs. Williams hired an attorney. Mrs. Williams' attorney sent a letter to the Pension Fund on November 13, 2002, demanding that the Plan pay Mrs. Williams the single death benefit in the amount of $2,695.00 for 60 months. On December 6, 2002, Harold Kravitz, an attorney for the Pension Fund, responded in writing on the Plan's behalf to Mrs. Williams' demand. The Plan, through Mr. Kravitz, denied Mrs. Williams' claim to the single death benefit for three reasons. First, Mrs. Williams was a surviving spouse under a QDRO. Second, although Mr. Williams had designated Mrs. Williams as his beneficiary in the defined contribution portion of the Plan, he had not done so in the defined benefit portion. Third, the benefits available under the Plan could not be increased by the QDRO. Mrs. Williams filed a written appeal to the Board of Trustees from this denial on December 12, 2002.

Sometime in December of 2002, Mrs. Williams filled out the necessary paperwork for her retirement. Her last official day at the Veterans Administration was December 31, 2002, more than two weeks after the Pension Fund initially denied her claim to the single death benefit. At the time of her retirement, Mrs. Williams still had not read the Plan document. She saw it for the first time at her deposition after this case was filed.

### G. THE BOARD'S FINAL DENIAL OF THE SINGLE DEATH BENEFIT TO MRS. WILLIAMS

On January 7, 2003, while Mrs. Williams' appeal was pending, Mr. Kravitz, the Pension Fund's attorney, wrote a memorandum to Mr. Stewart. In the memorandum, Mr. Kravitz opined as follows: (1) that Mrs. Williams needed to "produce a written beneficiary designation signed by the beneficiary [Mr. Williams] in order to create a beneficiary under this plan;" and (2) that there was no conflict between the SPD and the Plan, so that Mrs. Williams would not be prevented by the QDRO from receiving the single death benefit under the Plan if she had been designated as the beneficiary. When he wrote the memorandum, Mr. Kravitz had not been told—see details below—that in other

---

5. Mrs. Williams got the figure of $2,695.00 from a table in the SPD, as the amount paid at normal retirement at age 62 for a participant with 30 years' service.

I do not credit Mrs. Williams' testimony that the single death benefit was not discussed at this meeting. Given that Mrs. Williams was asking for this benefit to be paid to her, and that this was her third trip to the Pension Fund's office, I find it difficult to believe that she and Mr. Stewart did not expressly discuss the benefit.

cases the single death benefit had been paid to individuals who had not been listed as beneficiaries on the new form. Nor had Mr. Kravitz been provided with a copy of the QDRO when he penned the memorandum.

Mr. Stewart disagreed with Mr. Kravitz' second opinion. On January 23, 2003, Mr. Stewart told the Board at a meeting that he did not believe that Mrs. Williams should receive the single death benefit in addition to the monthly benefit of $755.00 she was already getting. Royal White, one of the trustees who attended this meeting, acknowledged that the SPD might not spell things out correctly, but believed that a person could not "double dip"—i.e., receive both the normal monthly benefit pursuant to a QDRO and the single death benefit. In a note to the Plan's actuary, Peter Verne, Mr. Stewart wrote: "[W]e still need to amend the pension plan to close this loophole and be more specific about the fact that [the single death benefit] is not an additional benefit but is tied to the main benefit." [6]

On February 25, 2003, the Board denied Mrs. Williams' appeal in a written letter. The Board explained that "it was never the intention of the Trustees to pass two pension benefits to surviving spouses, especially if they are a beneficiary of a QDRO." According to the Board, a spouse receiving benefits under a QDRO was expressly excluded from the single death benefit. Furthermore, although Mrs. Williams was listed a beneficiary under the defined contribution portion, she was not separately listed as a beneficiary as required for the single death benefit (which was a pension benefit). The Board point-

ed to the SPD, which warned that no pension would be paid unless a beneficiary was designated, and concluded that Mrs. Williams had failed to show that she had been "harmed by having relied on the SPD." Finally, the Board noted that, under the QDRO, Mrs. Williams was treated as being the "surviving spouse," and therefore, for pension purposes, Mr. Williams was considered married.[7] This meant that the single death benefit—which applied only to an "unmarried employee"—was not available.

## H. THE PENSION FUND'S TREATMENT OF SIMILAR SINGLE DEATH BENEFIT CLAIMS

Since October of 1996, the Plan has paid 23 claims for the single death benefit. For 17 of these 23 paid claims, the Pension Fund cannot locate or find a separate form entitled "ILA Pension Survivor Benefit Elections Form." Although Mr. Stewart testified that he saw the election/beneficiary forms for at least some of these paid claims, I do not credit this portion of his testimony. I find, based on the lack of records and the demeanor of Mr. Stewart, that the Plan has paid over a dozen single death benefit claims even though the participant did not use the designated separate form to make an election or name a beneficiary.

Mrs. Williams' claim is the first single death benefit claim the Pension Fund has denied. This claim is also the first time the Pension Fund has raised the failure to separately designate a separate beneficiary for the benefit.

---

**6.** At trial Mr. Stewart acknowledged that the SPD needed an additional bullet point to make this clear. Yet, as of the time of trial, no such bullet point had been added.

**7.** The Plan does not define "surviving spouse," but defines "spouse" in Section 1.29

as "the person who is the legal spouse of the Employee (or Pensioner) at the earlier of the time of his death or his Annuity Starting Date." It also states that the rights of divorced spouses, "if any, shall be as stated in Section 3.15."

On the other hand, no beneficiary under the Plan has ever been paid both an accrued benefit (pursuant to a QDRO) and a single death benefit.

## II. THE PARTIES' CONTENTIONS

Mrs. Williams asserts three main arguments in support of her claim to the single death benefit. First, there is a conflict between the SPD and the Plan, and she relied upon the SPD. Second, the Board is estopped from denying her the single death benefit. Third, the Board's denial of her claim for the single death benefit was erroneous and must be set aside under the "heightened arbitrary and capricious" or "arbitrary and capricious" standards.

The Pension Fund, on the other hand, argues that Mrs. Williams has not shown any detrimental reliance on any differences between the SPD and the Plan. It also contends that there is no estoppel, and that its denial of the single death benefit was not "arbitrary and capricious."

## III. ESTOPPEL

■ I address Mrs. Williams' estoppel claim first, because it is the easiest to resolve. The Eleventh Circuit recognizes a narrow estoppel principle under ERISA. An ERISA participant or beneficiary can assert estoppel if there is an ambiguous provision in the plan, the administrator or insurer interpreted the ambiguous provision, and the participant or beneficiary detrimentally relied on that interpretation. Estoppel, however, cannot be used to orally modify or alter the unambiguous terms of the plan. *See, e.g., Glass v. United of Omaha,* 33 F.3d 1341, 1345, 1347 (11th Cir.1994); *Lordmann Ent., Inc. v. Equicor, Inc.,* 32 F.3d 1529, 1534 (11th Cir. 1994). For the reasons which follow, I reject Mrs. Williams' estoppel claim.

■ First, the language in the Plan is not ambiguous with respect to the facts here. Section 2.07(a) states that the single death benefit is available if an active employee dies "unmarried at the time of his death and who leaves no former Spouse appointed as his surviving Spouse under the terms of a Qualified Domestic Relations Order." Putting aside the parties' dispute about how beneficiaries are properly designated for the single death benefit, this quoted language makes clear that a former surviving spouse who is a surviving spouse under a QDRO (e.g., Mrs. Williams) is not eligible for the single death benefit. "When plan documents unambiguously address the substantive rights of the parties at issue, the plan language controls, absent a showing of intentional fraudulent promises by the insurer in formal communications with the insured." *Meadows v. Cagle's, Inc.,* 954 F.2d 686, 691 (11th Cir.1992). There were no such intentional fraudulent promises in this case.

Second, even assuming that Section 2.07(a) was somehow ambiguous and could be read to allow a surviving spouse like Mrs. Williams to get the single death benefit notwithstanding her status under the QDRO, Mrs. Williams has not shown that the Board or its managers provided her with an interpretation of Section 2.07(a) that promised her the single death benefit. At most, Mr. Stewart and Mr. Montgomery generally told Mrs. Williams that she was Mr. Williams' beneficiary and that she would be "taken care of." In fact, Mrs. Williams was listed as Mr. Williams' beneficiary for various benefits, which she later received. But at no time did Mr. Stewart or Mr. Montgomery tell Mrs. Williams that, despite the QDRO, she would in fact receive the single death benefit. Indeed, Ms. Quinn advised Mrs. Williams to get an attorney because Mr. Stewart and Mr. Montgomery would not commit to giving Mrs. Williams the single death benefit.

Third, Mrs. Williams did not detrimentally rely on any interpretation given to her by Mr. Stewart or Mr. Montgomery. Assuming for the sake of argument that there was a favorable interpretation of Section 2.07(a) by Mr. Stewart or Mr. Montgomery, any such interpretation could only have been given to Mrs. Williams after the operative event in this case—the death of Mr. Williams. In other words, there was nothing that Mrs. Williams did (or failed to do) before Mr. Williams' death that could have been affected by any such interpretation. And even if a post-death representation could theoretically lead to detrimental reliance by Mrs. Williams, there was no such reliance here. By the time Mrs. Williams quit her job at the Veterans Administration, the Pension Fund had denied her claim and Mrs. Williams had filed a written appeal from the denial. Mrs. Williams therefore left her job at the Veterans Administration knowing that her claim for the single death benefit had been rejected. Things might be different if the Pension Fund had initially given Mrs. Williams the single death benefit, Mrs. Williams then retired because of the increased income she expected, and the Board subsequently reversed the initial decision and denied Mrs. Williams the single death benefit. But that is not what happened.

## IV. THE BOARD'S DENIAL OF THE SINGLE DEATH BENEFIT

■ As explained in *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1138 (11th Cir.2004), a district court reviewing a denial of benefits under § 1132(a)(1)(B) of ERISA generally engages in the following analysis. First, the court applies the de novo standard of review to determine whether the administrator's "benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision)." If it is not wrong, the inquiry is completed and the decision is affirmed. Second, if the administrator's decision "in fact is 'de novo wrong,'" the court must determine whether the administrator was vested with discretion in reviewing claims. If it was not, the judicial inquiry ends and the decision is reversed. Third, if the administrator's decision was "de novo wrong," and the administrator was vested with discretion in reviewing claims, the court must determine whether reasonable grounds support the decision under the "more deferential arbitrary and capricious standard." If no reasonable grounds exist, then the administrator's decision is reversed. Fourth, if reasonable grounds do exist, the court must decide whether the administrator operated under a conflict of interest. Fifth, if there was no such conflict, the decision is affirmed. Sixth, if there was a conflict of interest, then the court must apply the "heightened arbitrary and capricious standard" to the decision and affirm or reverse as appropriate.

■ Courts interpreting ERISA plans employ normal principles of contract and insurance law, guided by federal common law and the congressional purposes underlying ERISA. *See Glass v. United of Omaha*, 33 F.3d 1341, 1347 (11th Cir.1994); *Arnold v. Life Ins. Co. of North America*, 894 F.2d 1566, 1567 (11th Cir.1990). *Accord Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 658 (7th Cir.2005); *Dobson v. Hartford Financial Services Group, Inc.*, 389 F.3d 386, 389 (2d Cir.2004). Absent a conflict with federal common law or ERISA's goals, the pertinent language is read "in the ordinary and popular sense as would a person of ordinary intelligence and experience, such that the language is given its generally accepted meaning." *Keszenheimer v. Reliance Standard Life Ins. Co.*, 402 F.3d 504, 506 (5th Cir.2005).

Turning first to the Board's denial of the single death benefit, and exercising plena-

ry review at the first stage of the analysis, I do not think that the denial was wrong or incorrect insofar as it was based on Mrs. Williams being a former surviving spouse under a QDRO. As noted above in the section on estoppel, Section 2.07(a) of the Plan states, unambiguously, that the single death benefit is available if, among other things, the employee is "unmarried at the time of his death and ... leaves no former Spouse appointed as his surviving Spouse under the terms of a Qualified Domestic Relations Order." A "spouse" is defined in Section 1.29 of the Plan as the "person who is the legal spouse of the Employee (or Pensioner) at the earlier of the time of his death or his Annuity Starting Date." This definition is consistent with the ordinary meaning of "spouse." *See, e.g.,* BLACK'S LAW DICTIONARY 1438 (8th ed. 2004) ("One's husband or wife by legal marriage."). Although the term "former spouse" is not defined in the Plan, the term can only be interpreted to mean a person who was married to the employee at some point in the past, but is no longer married to him. *See, e.g.,* SHORTER OXFORD ENGLISH DICTIONARY 1015 (5th ed.2002) ("former" means "earlier in time .... of the past, belonging to or occurring in an earlier period"). Mrs. Williams is a undoubtedly "former spouse" of Mr. Williams, as she was formerly married to him but was not married to him at the time of his death. Mrs. Williams is also a "surviving spouse" of Mr. Williams under the QDRO, and she is receiving benefits pursuant to the terms of the QDRO. In sum, the Board correctly determined that Mrs. Williams could not receive the single death benefit under Section 2.07(a) because she was Mr. Williams' former spouse and was the surviving spouse under the QDRO.

■ Assuming that the Board's denial was "de novo wrong," I turn to whether the Board was vested with discretion to interpret the Plan. The answer to that question is yes. The Plan provides that the Board, which is the ERISA administrator, "shall administer the Plan and have the power and duty to take all action and to make all decisions necessary or proper to carry out the plan. Without limiting the generality of the foregoing the Board shall have the following powers and duties: ... to interpret the Plan, and to resolve ambiguities, inconsistencies, and omissions, its interpretation and resolution to be finally conclusive and binding on all parties affected thereby." Similarly, the SPD provides that the Board "has the authority to interpret Plan provisions and decide disputes." Given this language in the governing documents, and the parties' agreement in the pretrial stipulation, I conclude that the applicable standard of review is the arbitrary and capricious standard. *See Cagle v. Bruner,* 112 F.3d 1510, 1516–17 (11th Cir.1997).

■ I reject Mrs. Williams' argument that the heightened arbitrary and capricious standard applies. Contrary to Mrs. Williams' argument, the Board does not have a conflict of interest requiring this heightened standard of review. The Pension Fund is not-for-profit, involves contributions by several employers, and there is no evidence that the Board's trustees have any personal economic interest in a decision to deny benefits. Furthermore, the Board is comprised of seven labor and seven management trustees, and a neutral third party casts the deciding vote in case of a deadlock or tie. Under similar circumstances, other federal courts have refused to apply the heightened arbitrary and capricious standard, and I agree with their decisions. *See Filon v. Seafarers Health & Benefits Plan,* 2005 WL 1270379, *4 (M.D.Fla.2005); *Martinez v. District 1199J Nat. Union of Hospital & Health Care Employees,* 280 F.Supp.2d 342, 353 (D.N.J.2003); *Muse v. Central States*

*Southeast and Southwest Areas Health Welfare & Pension Funds*, 227 F.Supp.2d 873, 876–77 (S.D.Ohio 2002).

█ The Board's denial of the single death benefit to Mrs. Williams is arbitrary and capricious only if "no reasonable basis exists for the decision." *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1325–26 (11th Cir.2001). Mrs. Williams cannot satisfy this standard. At the very least, a reasonable reading of Section 2.07(a) is that a former spouse who is also a surviving spouse under a QDRO cannot receive the single death benefit. Although not necessary to my decision, I also note that the Board's reading of Section 2.07(a) bears a rational relationship to the Plan, as it may be thought that a person like Mrs. Williams would be "double dipping" if she received both the accrued monthly benefit until her death pursuant to the QDRO and the single death benefit for 60 months. The Board could reasonably have concluded that the single death benefit was intended for those former spouses or beneficiaries who did not have any right to benefits under a QDRO and would otherwise be left without any benefits. Mrs. Williams posits that she would not exceed the Plan's actuarial values even if she received the single death benefit for 60 months, but even if she is right on that point, it is not dispositive, for it only shows that the Board could possibly have taken a different position (and not that the position it actually took was arbitrary and capricious). Finally, the Board's reading of Section 2.07(a) is consistent with the way that it has administered the single death benefit. At no time has the single death benefit been paid to a former spouse who was also receiving accrued benefits pursuant to a QDRO. Mrs. Williams, in other words, is not being treated differently than others in her position.[8]

## V. MRS. WILLIAMS' CLAIM OF A CONFLICT BETWEEN THE SPD AND THE PLAN

Mrs. Williams also contends that there is a conflict between the SPD and the Plan, and that the SPD—which does not exclude the payment of the single death benefit to a former spouse who is also a surviving spouse under a QDRO—should control. The Board concedes, in its proposed findings of fact and conclusions of law, that there is a conflict between the SPD and the Plan. It says that that the SPD contains an omission—it does not indicate that the single death benefit is unavailable to an individual leaving a surviving spouse who receives benefits under a QDRO. The Board maintains, however, that the conflict is reconcilable because the SPD and the Plan, when read together, make it clear that a participant who leaves a surviving spouse for pension purposes and dies without marrying the single death benefit is not available.

I agree with Mrs. Williams that there is a conflict between the SPD and the Plan. If either the SPD or the Plan had merely been silent as to the requirements for the

8. Essentially for the reasons stated in paragraphs 116–140 of Mrs. Williams' proposed findings of fact and conclusions of law, I do agree with Mrs. Williams that the Board's denial cannot be upheld insofar as it was based on the theory that Mr. Williams did not properly designate Mrs. Williams on a specific form as his beneficiary for the single death benefit. First, the Board's interpretation was de novo wrong because neither the Plan nor the SPD specifically described the form that was supposed to be used. *See Liberty Life Assurance Co. v. Kennedy*, 358 F.3d 1295, 1300–01(11th Cir.2004). Second, the Board's denial on this theory was arbitrary and capricious. Mrs. Williams was listed as Mr. Williams' beneficiary, and I have found—as a matter of historical fact—that the Board has paid the single death benefit in over a dozen cases like this one where the supposedly required beneficiary form was not used.

single death benefit, there might not be a conflict, *see Carron v. Kemper Nat. Services, Inc.*, 2005 WL 894840, *4 (11th Cir. 2005), but here both documents address the issue, and the Plan includes a disqualifying factor that the SPD does not (i.e., a former spouse who is a former spouse under a QDRO).

■ But the existence of a conflict between the SPD and the Plan is not enough for Mrs. Williams to prevail. In some circuits, in cases of a such a conflict, an employee or beneficiary need not show reliance on the SPD. For example, the Third Circuit does not require an employee or beneficiary to plead or prove reliance on the SPD, while the Second Circuit requires only a showing of prejudice (i.e., a showing that the participant or beneficiary was "likely" to have been harmed as a result of a deficient SPD). *Compare Burstein v. Retirement Account Plan*, 334 F.3d 365, 380–81 (3d Cir.2003), *with Burke v. Kodak Retirement Income Plan*, 336 F.3d 103, 113 (2d Cir.2003). In the Eleventh Circuit, however, when an employee or beneficiary bases his claim on the SPD, and the employer or administrator points to conflicting language in the plan, the participant or beneficiary must, in addition to showing a conflict, demonstrate reliance on the language or terms in the SPD. *See Branch v. Bernd Co.*, 955 F.2d 1574, 1578–80 (11th Cir.1992) ("to prevent an employer from enforcing the terms of a plan that are inconsistent with those of the plan summary, a beneficiary must prove reliance on the summary"). A participant or beneficiary who fails to read the SPD, for example, cannot show reliance on it. *See Kennedy*, 358 F.3d at 1302; *Collins v. American Cast Iron Pipe Co.*, 105 F.3d 1368, 1371 (11th Cir.1997); *McKnight v. Southern Life & Health Ins. Co.*, 758 F.2d 1566, 1570–71 (11th Cir.1985).

The Eleventh Circuit has never addressed whether there has to be *detrimen-* *tal* reliance in case of a conflict. I agree with Judge Carnes, however, that "in this context, a requirement of reliance includes a showing of detriment.... An employee or beneficiary is not harmed by non-detrimental reliance, and we ought not disregard a plan's otherwise controlling terms because of an omission from a summary plan description in the absence of harm." *Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1147, 1156–57 (11th Cir.2001) (concurring opinion). Judge Carnes' view is consistent with the Eleventh Circuit's rationale for the requirement of reliance and the close relationship between the the principles of reliance and estoppel under ERISA. *See Kennedy*, 358 F.3d at 1302 (11th Cir.2004) ("Reliance is relevant only when an estoppel principle is present, such as when an employee asserts he or she is entitled to benefits under the language of a summary plan description and the employer contends that a plan document controls and precludes benefits.").

■ In this case, and as explained earlier with regard to the estoppel claim, Mrs. Williams has failed to show detrimental reliance. First, she was unaware of the SPD until after Mr. Williams' death, so she did not take any detrimental action based on the SPD before his passing. Nor has there been any evidence that Mr. Williams detrimentally relied on the SPD before his death. Second, Mr. Stewart and Mr. Montgomery told Mrs. Williams that she was not eligible for the single death benefit. At the very least, they never told her that she qualified for, and would receive, the single death benefit. Third, at the time that Mrs. Williams chose to retire, her claim for the single death benefit had been denied. Her decision to retire in the face of that adverse decision was not reasonable.

## VI. Conclusion

The Board's denial of the single death benefit to Mrs. Williams was correct given the language of Section 2.07(a) of the Plan. Even if the denial was "de novo wrong," it was not arbitrary or capricious because the Board's reading of Section 2.07(a) was reasonable. Mrs. Williams' claims of estoppel and conflict fail because, among other things, Mrs. Williams has not shown detrimental reliance.

A final judgment in favor of the Pension Fund will be issued separately.