[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15079
_____

D.C. Docket No. 2:07-cv-00122-JRH-JEG,
BKCY No. 02bkc21669-JSD

DURANGO-GEORGIA PAPER CO., et al.,

Plaintiffs - Appellants,

versus

H.G. ESTATE, LLC, et al.,

Defendants - Appellees.
_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(January 7, 2014)

Before TJOFLAT and COX, Circuit Judges, and MOTZ,* District Judge.

TJOFLAT, Circuit Judge:

_____

  * The Honorable J. Frederick Motz, United States District Judge for the District of
Maryland, sitting by designation.

Under the Employee Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 829, 29 U.S.C. §§ 1001–1461 (2006), an employer that has created and maintains a defined benefit pension plan for its employees must fund the plan as dictated by 29 U.S.C. § 1082(a).[1] If the employer responsible for maintaining the plan—referred to in ERISA as a "contributing sponsor"[2]—is a member of a "controlled group," the employer and the other members of the controlled group are jointly and severally liable for funding the plan. 29 U.S.C. § 1082(b).[3] A

---

[1] 29 U.S.C. § 1082(a) mandates the minimum funding for an ERISA pension plan and states, in part:

(a) Requirement to meet minimum funding standard

(1) In general

A plan to which this part applies shall satisfy the minimum funding standard applicable to the plan for any plan year.

(2) Minimum funding standard

For purposes of paragraph (1), a plan shall be treated as satisfying the minimum funding standard for a plan year if—

(A) in the case of a defined benefit plan which is a single-employer plan, the employer makes contributions to or under the plan for the plan year which, in the aggregate, are not less than the minimum required contribution determined under section 1083 of this title for the plan for the plan year, . . . .

The provisions of 29 U.S.C. § 1083 referred to in § 1082 are not pertinent to the issues in this appeal.

[2] See 29 U.S.C. § 1301(a)(13) ("[C]ontributing sponsor, of a single-employer plan, means a person described in section 1082(b)(1) of this title . . . ." (internal quotation marks omitted)).

[3] 29 U.S.C. § 1082(b) states:

2

"controlled group" is defined as an organization or individual that is under

common control with at least one other organization or individual.  29 U.S.C.

§ 1304(a)(14).[4]

_____

(b) Liability for contributions

(1) In general

Except as provided in paragraph (2), the amount of any contribution required by this section (including any required installments under paragraphs (3) and (4) of section 1083(j) of this title) shall be paid by the employer responsible for making contributions to or under the plan.

(2) Joint and several liability where employer member of controlled group

If the employer referred to in paragraph (1) is a member of a controlled group, each member of such group shall be jointly and severally liable for payment of such contributions.

[4] 29 U.S.C. § 1301(a)(14) provides:

In the case of a single-employer plan—

(A) "controlled group" means, in connection with any person, a group consisting of such person and all other persons under common control with such person;

(B) the determination of whether two or more persons are under "common control" shall be made under regulations of the [PBGC] which are consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under subsections (b) and (c) of section 414 of Title 26.

 "The term 'person' means an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."  29 U.S.C. § 1002(9).  Applicable regulations also include "trades or businesses" as persons that can be under common control.  See 29 C.F.R. § 4001.3(b)(2).  Neither the U.S. Code nor Treasury regulations define "trade or business."

26 C.F.R. § 1.414(c)-2, which operationalizes 26 U.S.C. 414(c) and is titled "Two or more trades or businesses under common control," states in pertinent part:

3

Title IV of ERISA establishes a pension benefit insurance program that guarantees that pension plan beneficiaries will receive their basic nonforfeitable benefits in the event that the employer that created the pension plan is unable to pay pension benefits when due.  29 U.S.C. §§ 1321–22.[5]  The Pension Benefit Guaranty Corporation (the "PBGC")—a government corporation within the

> (a) In general.  For purposes of this section, the term "two or more trades or businesses under common control" means any group of trades or businesses which is either a "parent-subsidiary group of trades or businesses under common control" as defined in paragraph (b) of this section. . . .  For purposes of this section and §§ 1.414(c)–3 and 1.414(c)–4, the term "organization" means a sole proprietorship, a partnership (as defined in section 7701(a)(2)), a trust, an estate, or a corporation.
>
> (b) Parent-subsidiary group of trades or businesses under common control—(1) In general.  The term "parent-subsidiary group of trades or businesses under common control" means one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization if—
>
> (i) A controlling interest in each of the organizations, except the common parent organization, is owned (directly and with the application of § 1.414(c)–4(b)(1), relating to options) by one or more of the other organizations; and
>
> (ii) The common parent organization owns (directly and with the application of § 1.414(c)–4(b)(1), relating to options) a controlling interest in at least one of the other organizations, excluding, in computing such controlling interest, any direct ownership interest by such other organizations.

26 C.F.R. § 1.414(c)-2.  The first example provided in this regulation to describe trades or businesses under common control mirrors almost identically the ownership structure of the various companies described in part I, infra.

[5] Section 1321 delineates the types of employee retirement plans that are insured under ERISA.  See generally 29 U.S.C. § 1321.  Section 1322 outlines which benefits are guaranteed by the insurance program and sets a statutory maximum on the amount of money beneficiaries will receive under the insurance policy.  See generally 29 U.S.C. § 1322.

Department of Labor—is responsible for administering and enforcing the insurance program. 29 U.S.C. § 1302(a). Under ERISA, an employer that has created a defined benefit plan for its employees must also pay premiums to the PBGC to fund the insurance program as the contributing sponsor. 29 U.S.C. § 1307. Like the minimum-funding provision, if the employer is a member of a controlled group, all members of the controlled group are jointly and severally liable for any premiums. 29 U.S.C. 1307(e)(2). In the event that the contributing sponsor can no longer pay benefits when they are due, the PBGC is authorized to terminate the plan, 29 U.S.C. § 1342, and to demand that the contributing sponsor and the members of the controlled group provide for the unfunded benefit liabilities, 29 U.S.C. § 1362.

This case presents a question of first impression: whether under ERISA the trustee of a corporation that is a contributing sponsor and is in bankruptcy can maintain an action for the benefit of the bankruptcy estate and the estate's unsecured creditors against the corporation's former owner (as a former member of the controlled group) for liabilities arising from the termination of a pension plan. For the reasons set out below, we hold that the answer is no.

This opinion proceeds in four parts. Part I presents the facts giving rise to this appeal. Part II recounts the procedural history of the case. In part III, we resolve an objection to our jurisdiction to consider this appeal. Finally, in part IV,

we explain why a corporate employer undergoing bankruptcy reorganization cannot pursue an action for the benefit of its bankruptcy estate, and thus its unsecured creditors, against the employer's former owner for liabilities arising from the termination of a pension plan. A brief conclusion follows.

I.

In January 1999, H.G. Estate, LLC, a Delaware limited liability company, organized Gilman Paper Company (the "PAPER COMPANY") under Georgia law and became its sole shareholder. Once organized, the PAPER COMPANY acquired a paper mill in St. Marys, Georgia, and created a defined benefit plan for its employees and former employees.[6] Under 29 U.S.C. §§ 1082(b)(2) and 1307, the PAPER COMPANY, H.G. Estate, LLC, the Howard Gilman Foundation, Gilman Converting Corporation, and Gilman Converting, LLC became a controlled group and thus were liable for funding the pension plan and for paying insurance premiums to the PBGC.[7] In December 1999, H.G. Estate, LLC sold all

---

[6] The PAPER COMPANY was organized as part of a corporate restructuring undertaken to facilitate the administration of the estate of Howard Gilman, deceased. For purposes of this appeal, it is sufficient to note that the PAPER COMPANY merged with the former Gilman Paper Company, which previously operated the paper mill and the ERISA-qualified pension plan giving rise to this appeal. That pension plan was created in 1965.

[7] These entities were members of a controlled group because H.G. Estate, LLC owned 100 percent of the shares of the PAPER COMPANY, Gilman Converting Corporation, and Gilman Converting, LLC and because the Howard Gilman Foundation was the sole owner and member of H.G. Estate, LLC and provided the funds through H.G. Estate, LLC to maintain the PAPER COMPANY's pension plan. See generally 26 C.F.R. § 1.414(c)-2(e) example 1.

of its shares of the PAPER COMPANY, Gilman Converting Corporation and Gilman Converting, LLC to Durango Paper Company, a corporation and a wholly owned subsidiary of Corporación Durango, also a corporation, for nearly $120 million. The transaction was facilitated by Bank of America Securities, LLC. By operation of law, those entities assumed the controlled group positions previously occupied by H.G. Estate, LLC and the Howard Gilman Foundation and thus became liable for funding the PAPER COMPANY's pension plan and for paying insurance premiums to the PBGC.[8]

In July 2002, the PAPER COMPANY decided to close its mill. In September, the mill ceased production. On October 7, 2002, Operadora Omega Internacional, a corporation, acquired 100 percent of the shares of Durango Paper Company from Corporación Durango and assumed its role as a member of the controlled group.[9] By the end of the month, the PAPER COMPANY had closed its mill and fired nearly all of its employees.

---

[8] Durango Paper Company changed the PAPER COMPANY's name to Durango-Georgia Paper Company. We still refer to that entity as the PAPER COMPANY. Durango Paper Company changed the names of Gilman Converting Corporation and Gilman Converting, LLC to Durango-Georgia Converting Corporation and Durango-Georgia Converting, LLC, respectively.

[9] We take judicial notice that Operadora Omega Internacional is an affiliate of Corporación Durango. See generally Corporación Durango, Report of Foreign Private Issuer Pursuant to Rule 13A-16 or 15D-16 of the Securities Exchange Act of 1934 (Form 6-K) (May 12, 2003).

On October 29, 2002, the PAPER COMPANY's creditors successfully petitioned the Bankruptcy Court for the Southern District of Georgia for relief under Chapter 7 of the Bankruptcy Code.[10]  The next month, the PAPER COMPANY moved the Bankruptcy Court to transform the Chapter 7 case into a Chapter 11 proceeding in order to reorganize the company.[11]  The court granted its motion.

In June 2005, while the Chapter 11 case was pending, the PBGC brought an action against the PAPER COMPANY in the United States District Court for the Southern District of Georgia to terminate the pension plan.  In the context of ERISA's Title IV, termination "generally refers to the cessation of Title IV coverage including the system of insured guaranteed benefits."  Lee T. Polk,

---

[10]  See generally 11 U.S.C. § 303 (creating a procedure whereby creditors can commence an involuntary bankruptcy proceeding under Chapter 7 of the Bankruptcy Code).

[11]  See generally 11 U.S.C. § 706 (detailing the process for converting a bankruptcy proceeding from Chapter 7 to Chapter 11).  At the same time, Durango-Georgia Converting Corporation and Durango-Georgia Converting, LLC also sought reorganization in the Bankruptcy Court under Chapter 11.  Those Chapter 11 cases were consolidated with the PAPER COMPANY's Chapter 11 case.  In June 2004, the Bankruptcy Court confirmed a plan of liquidation for all three Durango entities, and a liquidating trustee proceeded to administer the bankruptcy estates.  The Durango-Georgia Converting Corporation and Durango-Georgia Converting, LLC cases are not before this court in this appeal.  They are named as plaintiffs in the style of the complaint now before us for review, but neither they nor any of the proceedings in their Chapter 11 cases are relevant here.  The case at hand is between the PAPER COMPANY's liquidating trustee and H.G. Estate, LLC and two other former members of the PAPER COMPANY'S controlled group.

ERISA Practice and Litigation § 10:44 (2013).[12]  The parties subsequently agreed

that the plan should be terminated, and on October 31, 2006, the District Court

entered an order terminating the plan as of March 1, 2004.  As a result of the

involuntary termination, the PAPER COMPANY and members of its controlled

group as of March 1, 2004, became liable to the PBGC for unpaid benefit

liabilities.  See 29 U.S.C. § 1362.[13]  The PBGC thereafter filed a claim in the

---

[12] An ERISA-qualified pension plan can be terminated in one of only three ways: standard termination, distress termination, or involuntary termination.  See generally 29 U.S.C. §§ 1341–42 (providing methods of terminating pension plans).  Involuntary termination—the method used in this case—occurs when the PBGC files suit requesting that a court terminate the plan.  29 U.S.C. § 1342.  To bring such a suit, the PBGC must first determine that a pension plan will not be able to pay benefits when due and that it is in the best interests of the plan beneficiaries that the plan be terminated.  29 U.S.C. § 1342(a).  Once the court terminates a pension plan, ERISA provides for the appointment of a trustee to administer the plan, and the court can appoint the PBGC to fill the role of trustee.  29 U.S.C. § 1342(b).  The trustee is granted various powers related to administering the plan, including the power to pay benefits due under the terminated plan.  See 29 U.S.C. § 1342(d).  In this case, the court appointed the PBGC as trustee of the terminated pension plan.  The distinction between when the PBGC acts as insurer and when it acts as trustee is of little consequence for this appeal, and we thus refer to the PBGC throughout this opinion without distinguishing the capacity in which it served.

[13] 29 U.S.C. § 1362 provides:

(a) In general

In any case in which a single-employer plan is terminated . . . by the [PBGC] under section 1342 of this title, any person who is, on the termination date, a contributing sponsor of the plan or a member of such a contributing sponsor's controlled group shall incur liability under this section.  The liability under this section of all such persons shall be joint and several. . . .

(b) Liability to the [PBGC]

(1) Amount of liability

(A) In general

Chapter 11 case for termination liability in the amount of $55 million—the amount

it estimated that the PAPER COMPANY would need if it were to fund the pension

plan sufficiently to satisfy all of the beneficiaries' claims in full.[14]

II.

On August 18, 2010, the liquidating trustee of the PAPER COMPANY's

bankruptcy estate ("Trustee") sued H.G. Estate, LLC, the Howard Gillman

Foundation, and W.O. Corporation[15] in the United States District Court for the

Southern District of Georgia[16] in an effort to recover for the bankruptcy estate the

---

Except as provided in subparagraph (B), the liability to the [PBGC] of a person described in subsection (a) of this section shall be the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan, together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the [PBGC]. . . .

[14] The $55 million represented the present day value of the total payments under the plan. The PBGC does not insure 100 percent of the payments due the beneficiaries under the plain wording of the pension plan. Rather, it insures the payments only partially. See generally 29 U.S.C. § 1322. In presenting its claim against the PAPER COMPANY then, the PBGC is seeking (1) reimbursement for the amounts paid the beneficiaries as insurance and (2) the uninsured portion of the sums due the beneficiaries. To the extent it seeks the uninsured portion, the PBGC is acting as the beneficiaries' trustee. See supra note 12.

[15] W.O. Corporation, according to the Trustee's complaint, was the "holder and administrator" of the PAPER COMPANY's pension plan prior to the sale of the company's shares to Durango Paper Company.

[16] The Trustee's complaint invoked the District Court's subject matter jurisdiction under 28 U.S.C. § 1334 and 29 U.S.C. § 1370(c). Section 1334, titled "Bankruptcy cases and proceedings," states, in pertinent part: "Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11." Section

amount of the claim that the PBGC filed against the estate in the Chapter 11 case.[17]

The Trustee alleged that H.G. Estate, LLC, the Howard Gillman Foundation, and

———————————————

1370, titled "Enforcement authority relating to termination of single-employer plans," provides in subsection (a):

> Any person who is with respect to a single-employer plan a . . . contributing sponsor, . . . and is adversely affected by an act or practice of any party (other than [the PBGC]) in violation of . . . [29 U.S.C. § 1369] may bring an action—
>
> (1) to enjoin such act or practice, or
>
> (2) to obtain other appropriate equitable relief (A) to redress such violation or (B) to enforce such provision.

Section 1370 provides in subsection (c):

> The district courts of the United States shall have exclusive jurisdiction of civil actions under this section.  Such actions may be brought in the district where the plan is administered, where the violation took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.  The district courts of the United States shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action.

As noted in the text, infra, the Trustee's cause of action against H.G. Estate, LLC the others is based on their alleged violation of § 1369.

[17]  The Trustee initially brought suit against H.G. Estate, LLC and the others in 2004 by commencing an adversary proceeding in the Bankruptcy Court.  The court dismissed the complaint without prejudice because the plan had not yet been terminated.  The Trustee renewed its claim in 2007, after the plan had been terminated, and this time the Bankruptcy Court—after determining it lacked jurisdiction to enter judgment on the ERISA claim—recommended that the District Court dismiss the complaint with prejudice for failing to state a claim for equitable relief.  The District Court allowed the Trustee to file a third amended complaint to clarify the equitable relief requested.

The third amended complaint also included several core bankruptcy claims and one non-core claim.  See generally 28 U.S.C. § 157 (describing the jurisdiction of the bankruptcy courts).  The non-core claim asserted that a claim H. G. Estate, LLC filed against the PAPER COMPANY should be subordinated to the unsecured claims of the general creditors because of H.G. Estate,

11

W.O. Corporation were jointly and severally liable with the PAPER COMPANY under 29 U.S.C. § 1369 as members of the former controlled group.[18]  Specifically, the Trustee alleged that H.G. Estate, LLC sold its shares of the PAPER COMPANY with a principal purpose of evading the liability that would have been imposed against it and the members of the former controlled group under 29 U.S.C. § 1362 in the event that the PBGC had terminated the pension plan while H.G. Estate, LLC still owned the PAPER COMPANY.  As relief, the Trustee sought a "judgment in equity for indemnification, exoneration, or contribution . . . in an amount not less than the amount paid or payable to the PBGC by Plaintiff arising out of termination of the Pension Plan."

--------

LLC's alleged violation of 29 U.S.C. § 1369.  The core claims dealt with certain preferential transfers and objections to claims.

The District Court dismissed the non-core claim with prejudice because it was subsumed by the claim the Trustee was asserting against H.G. Estate, LLC (the claim before us on appeal). The court severed the core claims from the Trustee's complaint and referred them to the Bankruptcy Court.  And the court disposed of the Trustee's claim before us by entering a final judgment dismissing it for failure to state a claim for relief.  The core and non-core claims are relevant to this appeal only insofar as they affect our analysis in part III, infra, regarding whether we have jurisdiction over the instant appeal.  We hold that they do not deprive us of jurisdiction.

[18]  29 U.S.C § 1369 provides, in pertinent part:

> If a principal purpose of any person in entering into any transaction is to evade liability to which such person would be subject under this subtitle and the transaction becomes effective within five years before the termination date of the termination on which such liability would be based, then such person and the members of such person's controlled group (determined as of the termination date) shall be subject to liability under this subtitle in connection with such termination as if such person were a contributing sponsor of the terminated plan as of the termination date.

H.G. Estate, LLC moved the District Court to dismiss the Trustee's complaint for failure to state a claim for relief.  On September 29, 2011, the court granted its motion on the ground that the relief sought did not constitute equitable relief—rather, it was for a money judgment[19]—and entered a final judgment for H.G. Estate, LLC and is codefendants.  The Trustee appeals the District Court's decision.  We affirm.

---

[19] See Fed. R. Civ. P. 12(b)(6).  ERISA provides that, once a pension plan is terminated, a party other than the PBGC is limited in the relief it can obtain from a controlled group—whether the current controlled group or a former controlled group.  Whereas ERISA authorizes the PBGC to seek legal or equitable relief against a controlled group for failing to fund the now-terminated pension plan, see 29 U.S.C. §§ 1362, 1369, the relief any other party may obtain is equitable only—an injunction or "other appropriate equitable relief (A) to redress such violation or (B) to enforce such provision,"  29 U.S.C. § 1370.  The Trustee brought this lawsuit on behalf of parties other than the PBGC—three of the members of the immediate controlled group: the consolidated bankruptcy estates of the PAPER COMPANY, Durango-Georgia Converting Corporation, and Durango-Georgia Converting, LLC.  (The Trustee omitted as party-plaintiffs two members of the immediate controlled group—Durango Paper Company and Operadora Omega Internacional (its sole shareholder)).

The relief the Trustee sought sounded in equity: "indemnification, exoneration, or contribution . . . in an amount not less than the amount paid or payable to PBGC by Plaintiff arising out of the termination of the Pension Plan."  The District Court concluded, however, that the relief the Trustee was seeking was a lump sum amount—a legal remedy in the form of a money judgment.

As we conclude in part IV, infra, the Trustee does not have a cause of action to recover for the PAPER COMPANY's bankruptcy estate the funds needed to satisfy the claim that the PBGC submitted on behalf of itself and the pension plan beneficiaries.  We therefore pretermit further discussion of the issue of whether the relief the Trustee is seeking is legal or equitable. Cf. Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1293 n.3 (11th Cir. 2010) ("[W]e may affirm [the lower court's] judgment on any ground that finds support in the record." (internal quotation marks omitted) (citations omitted)).

13

III.

Before turning to the merits of the Trustee's appeal, we must address H.G. Estate, LLC's objection to our jurisdiction to consider the appeal.   If we lack jurisdiction to entertain the appeal, we must dismiss it.  See Mathis v. Zant, 903 F.2d 1368, 1372–73 (11th Cir. 1990).  H.G. Estate, LLC contends that we lack jurisdiction because the District Court's September order was not a final decision.  We disagree.  As indicated in note 17, supra, the District Court finally disposed of all of the claims before it, leaving nothing to be decided.  We thus have jurisdiction pursuant to 28 U.S.C. § 1291.[20]  We now turn to the merits of this appeal.

IV.

We begin and end our consideration of the merits of the Trustee's appeal by addressing an issue the District Court did not decide—whether the Trustee has a cause of action under 29 U.S.C. § 1369.[21]  We conclude that it does not.

---

[20]  28 U.S.C. § 1291 provides that:

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court.

[21] Following oral argument, we requested that the parties submit supplemental briefing on the follow question:

Whether 29 U.S.C. § 1370 authorizes a bankruptcy trustee to recover for the benefit of the bankruptcy estate and its unsecured creditors money a predecessor

14

Under § 1369, if "any person" sells the shares of its corporation in order to evade termination liability under 29 U.S.C. § 1362, "then such person and the members of such person's controlled group . . . shall be subject to liability" under § 1362 "as if such person were a contributing sponsor of the terminated plan as of the termination date." 29 U.S.C. § 1369. For purposes of these statutory provisions, H.G. Estate, LLC is "any person" and it—together with the PAPER COMPANY, the Howard Gillman Foundation, Gillman Converting Corporation, and Gillman Converting, LLC—was a member of the controlled group for the PAPER COMPANY in December 1999, when H.G. Estate, LLC sold its shares of the PAPER COMPANY to Durango Paper Company. If, as the Trustee alleges in its complaint, H.G. Estate, LLC sold the shares for "a principal purpose . . . to evade" its § 1362 liability in the event the PBGC terminated the pension plan, then H.G. Estate, LLC and the other members of the former controlled group would be treated as if they were members of the controlled group at the time of the plan's termination on March 1, 2004. Such a determination would mean that H.G. Estate, LLC, the Howard Gilman Foundation, and W.O. Corporation would be jointly and

---

contributing sponsor owes, pursuant to 29 U.S.C. § 1369, to the Pension Benefit Guaranty Corporation as the terminated pension plan's insurer and trustee?

The PBGC also filed a letter brief as amicus curiae in response to our question.

15

severally liable with the current members of the controlled group—Durango Paper Company, Durango-Georgia Converting Corporation, Durango-Georgia Converting, LLC, and Operadora Omega Internacional—for the unfunded benefit liabilities owed under 29 U.S.C. § 1362.

Because we are reviewing the dismissal of the Trustee's complaint for failure to state a claim, we accept the Trustee's allegation as true. The question is whether the joint and several liability under § 1369 runs to the PAPER COMPANY or to the pension plan's beneficiaries and the PBGC—which serves as the plan's insurer and trustee, and which in those roles submitted a claim to the Bankruptcy Court for insurance proceeds it paid to the plan's beneficiaries and the uninsured portions of the benefits due to the beneficiaries under the plan.

We read the Trustee's complaint as alleging that H.G. Estate, LLC (and thus the two other former members of the PAPER COMPANY's controlled group) breached a duty owed to the PAPER COMPANY and that the Trustee has brought suit on behalf of the PAPER COMPANY's bankruptcy estate and the PAPER COMPANY'S unsecured creditors.[22] Indeed, the complaint represents that if the

---

[22] During oral argument and again in its supplemental brief, the Trustee treated its complaint as if it had brought the suit for the use and benefit of the PBGC, not the Paper Company's bankruptcy estate. The style of the complaint undermines this assertion. It reads that the action was being brought by "Bridge Associates, LLC as Liquidating Trustee of [the] Bankruptcy Estates," i.e., of the PAPER COMPANY, Durango-Georgia Converting Corp., and

16

Trustee fails to recover on its $55 million claim against the former controlled group, the bankruptcy estate, lacking the $55 million, will amount to not more than $15 million from the sale of the debtors' assets, of which the Trustee would distribute to the PBGC approximately $8.25 million, or 55 percent of the sale proceeds.  As we read the complaint, any money the Trustee recovers will go to the bankruptcy estate to be allocated among all of the general unsecured creditors, including the PBGC.[23]

---

Durango-Georgia Converting, LLC.  Indeed, in the District Court the Trustee, responding to H.G. Estate, LLC's motion to dismiss, expressly disclaimed the notion that it brought the action for the use and benefit of the PBGC.  The Trustee argued that "[Section 1370] could contemplate: (1) an enforcement by Plaintiffs against Defendants for the benefit of the PBGC who is owed termination liability (i.e. some sort of ex rel action where the court enters a judgment that the defendant is liable to the PBGC) or (2) an enforcement by plaintiffs for their own protection benefit . . . . The former cannot be correct." (emphasis added).

[23] On appeal, the Trustee attempts to reframe its complaint as having presented two causes of action—neither of which is being prosecuted for the benefit of the bankruptcy estates.  The first cause of action, which the Trustee describes in its opening brief, seeks a declaration that H.G. Estate, LLC violated § 1369 and is therefore jointly and severally liable with the PAPER COMPANY to the PBGC.  This declaratory judgment would presumably enable the PBGC to collect the termination liability from H.G. Estate, LLC directly and from the PAPER COMPANY via the claim it previously filed in the PAPER COMPANY's bankruptcy estate.

The Trustee articulated the second cause of action in the supplemental brief it filed at the court's request after oral argument.  This cause of action is a claim brought by the Trustee for the use and benefit of the PBGC; it seeks a judgment that "would designate the Trustee, on behalf of and for the benefit of the PBGC, as the judgment creditor, such that the Trustee would not be authorized to deposit the fruits of any levy on Gilman of the termination liability into the general account of the bankruptcy estate for unrestricted use."  The Trustee supports this claim by arguing that "no provision of 29 U.S.C. § 1370 prohibits the Trustee from acting as a de facto collection agent for the PBGC for a determination of Gilman's liability under § 1369."

It requires no citation of authority to say that a plaintiff cannot amend its complaint on appeal.  We therefore decline to consider either of these causes of action in determining whether

17

We find nothing in ERISA's provisions or its legislative history suggesting, much less stating outright, that the duty of a current or former controlled group to pay unfunded benefit liabilities is a duty owed to the employer as contributing sponsor, rather than to the plan's beneficiaries.  Indeed, the legislative history suggests the exact opposite.  The House Report describing the most recent relevant amendments to Title IV of ERISA speaks in terms of ensuring that plan beneficiaries receive that to which they are entitled.  The report states that § 1369—with its imposition of predecessor liability—was enacted "to protect the [PBGC's] insurance program from companies that transfer large amounts of unfunded benefits to a weaker company or that otherwise attempt to evade liability for their pension promises."  H.R. Rep. No. 99–300, at 279 (1985), reprinted in 1986 U.S.C.C.A.N. 756, 930.  Elsewhere, the report makes plain that "[i]n addition to transactions designed to evade liability to the PBGC, [§ 1369] also applies to any situations in which a principal purpose of a transaction is to evade liability to participants and beneficiaries for benefit entitlements."  Id. at 304, 1986 U.S.C.C.A.N. at 955 (emphasis added).

---

the Trustee's complaint can withstand a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss.

18

Congress anticipated that, as part of the involuntary termination procedure, the PBGC will "carefully scrutinize transfers of unfunded pension liabilities from stronger to weaker companies" to determine if pursuing an action under 29 U.S.C. § 1369 is appropriate in a given situation. Id. In this case, the PBGC could have brought an action against members of the former controlled group for termination liability. It declined to do so.[24] The Trustee cannot now seek a money judgment against that controlled group in favor of the bankruptcy estate and its unsecured creditors for liability that the PAPER COMPANY owes as contributing sponsor to the PBGC and the terminated plan's beneficiaries.[25]

---

[24] ERISA imposes a six-year statute of limitations in which the PBGC can bring an action. See 29 U.S.C. § 1303(e)(6). The limitations period has expired; thus, the PBGC can no longer file suit against the former controlled group for termination liability. Given our disposition of this appeal, we need not consider whether § 1370(f), which sets out the statute of limitations for Title IV actions not brought by the PBGC, would bar as untimely the two causes of action the Trustee advances in its opening brief and supplemental brief. See supra note 23.

[25] In the District Court, the PBGC did not take a position as to whether the Trustee could bring suit to enforce § 1369 and was unaware of any case that had decided the question. But it did "reiterate that any recovery obtained under that statute must be paid to [the] PBGC." In its supplemental amicus brief, the PBGC takes the position that the Trustee is authorized to bring an action for equitable to enforce § 1369, but again asserts that "any monetary recovery ultimately resulting from a successful assertion of section 1369 is payable solely to the PBGC." We give deference to PBGC's interpretation of ERISA. See Beck v. PACE Int'l Union, 551 U.S. 96, 104, 127 S. Ct. 2310, 2317, 168 L. Ed. 2d 1 (2007) ("We have traditionally deferred to the PBGC when interpreting ERISA, for to attempt to answer these questions without the views of the agencies responsible for enforcing ERISA, would be to embar[k] upon a voyage without a compass." (internal quotation marks omitted)). But, as we explain, supra, the Trustee did not purport to seek relief for the PBGC's benefit. While a future case may present a set of facts in which a contributing sponsor seeks to obtain money for the PBGC based on a predecessor sponsor's violation of § 1369, that is not this case. We therefore reserve judgment on that question for another day.

19

\*\*\*

ERISA's funding requirements were put in place for the benefit of plan beneficiaries, not for the protection of a bankrupt plan sponsor's unsecured creditors. The Trustee's complaint, because it was brought for the benefit of the bankrupt's unsecured creditors, fails to state a claim for relief. The judgment of the District Court is, accordingly,

AFFIRMED.