[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14968

_____

D.C. Docket No. 9:18-cv-81099-RLR

PENSION BENEFIT GUARANTY CORPORATION,

Plaintiff - Appellee,

versus

50509 MARINE LLC,
AMH GOVERNMENT SERVICES, LLC, et al.,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 24, 2020)

Before MARTIN, ROSENBAUM, and TALLMAN,* Circuit Judges.

---

* The Honorable Richard C. Tallman, Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

TALLMAN, Circuit Judge:

From the confluence of bankruptcy, employee benefits, and corporations law comes this most unusual case.  The answer to a seemingly simple but surprisingly complex question controls our disposition:  Did the Liberty Lighting Company exist in July 2012?  Liberty was an Illinois corporation that went bankrupt and dissolved under state law in the 1990s.  But if it nevertheless continued with the assistance of its sole stockholder owner as the sponsor of a pension plan under the federal Employee Retirement Income Security Act (ERISA), then federal law dictates that *other* companies owned by Liberty's owner may be held liable for the unfunded liability, which was paid by the government agency known as the Pension Benefit Guaranty Corporation (PBGC), when the plan ran out of funds.  Those companies—the appellants in this action—protest that they cannot be considered owned in common with Liberty for the simple reason that Liberty ceased to exist long ago.  We disagree.  Concluding that, in the unusual circumstances of this case, Liberty still existed in 2012 sufficiently to act as the plan's sponsor under ERISA, we affirm the district court.

I

Joseph Wortley owned Liberty Lighting Co., Inc. ("Liberty"), a unionized electrical supply manufacturing company based near Chicago in the late 1980s.  Prior to its ultimate dissolution, Liberty was the plan sponsor and administrator of

2

the "Liberty Lighting Co., Inc. Pension Plan for IBEW Employees" (the "Plan")

under Title IV of ERISA, 29 U.S.C. § 1301 *et seq.* Liberty ran into financial

trouble in the early '90s, entered bankruptcy and surrendered its assets to a creditor

in 1992, and was thereafter administratively dissolved under state law. Wortley,

Liberty's sole owner with 100% of the company's stock, soon followed with his

own personal bankruptcy in 1993, from which he was discharged in 1998. As part

of the bankruptcy proceedings, all of Wortley's assets were surrendered to a

trustee, including his stock in Liberty. Meanwhile, Wortley continued to act as the

Plan's administrator, signing papers on behalf of the Plan at the request of the

Plan's actuary for years after Liberty's purported dissolution. These signatures

were necessary to effect continuing payments to pensioners.

In 2012, as the Plan's funds ran low, the bank administering the Plan

notified PBGC of the Plan's looming insolvency. PBGC, as the federal agency

charged with protecting the retirement incomes of workers in private-sector

defined benefit pension plans, contacted Wortley to reach a settlement regarding

the unfunded remaining liability of the Plan. Wortley and PBGC eventually agreed

to a settlement that represented Liberty as having dissolved in the '90s and the

agreement contained language that Wortley believed established a final cutoff date

for his remaining liability by conveying "any and all powers, authority, et[] cetera,

that [Wortley] may have on behalf of Liberty [] and/or the Plan to PBGC" on July 31, 2012.

But six years later, PBGC brought suit against these 19 appellants ("the Companies") in the United States District Court for the Southern District of Florida, alleging that they, as other companies owned by Wortley, were nonetheless part of a "controlled group" with Liberty, and therefore were still liable for Liberty's unpaid pension benefits, premiums, interest, and penalties under 29 U.S.C. §§ 1306(a)(7), 1307, and 1362(a).  PBGC's theory of the case under ERISA is simple:  with Liberty unable to meet its ERISA obligations to its former employees, Wortley's other companies must foot the bill.  *See id.* § 1307(e)(2).

After denying the Companies' motion to dismiss, the district court granted summary judgment to PBGC on November 22, 2019.  The court based its finding on several alternate grounds:  (1) ERISA makes Liberty the contributing sponsor of the Plan, and no operation of state law can change that; (2) courts are authorized to make "federal common law" in pursuit of ERISA's scheme and goals, and finding that Liberty was the sponsor would further ERISA's central goal of protecting the interests of pension beneficiaries; and (3) Illinois law allows a dissolved company "to carry on in a manner necessary to wind up its affairs," so Liberty was able to continue in existence after ceasing business operations in order to meet its

4

obligations under the Plan.  The court reasoned that under the Companies' view of ERISA, "nobody was responsible for the pension plan," a result that "cannot be squared with ERISA as a whole," which "does not allow pension plans to exist in a state of limbo, devoid of any caretaker."  Final judgment was entered on December 6, 2019, and the Companies timely appealed.

## II

The district court had federal-question jurisdiction under 28 U.S.C. § 1331, and we have appellate jurisdiction under § 1291.

We review the granting of summary judgment de novo, viewing all facts in the light most favorable to the nonmoving party.  *See Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1357 (11th Cir. 2020).  Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III

This is, as the district court wrote in its summary-judgment order, "a difficult case."  It comes down to what seems on the surface an easy question:  On July 31, 2012, was Liberty the "contributing sponsor" of the "Liberty Lighting Co., Inc. Pension Plan for IBEW Employees" under Title IV of ERISA?[1]  If it was—

---

[1]  The Companies do not deny that Liberty was the Plan's sponsor before Liberty's dissolution. And no one questions that Wortley owns the requisite percentage of the stock of the 19 companies seeking to avoid Liberty's unfunded pension plan liability.

5

and if Joseph Wortley was its owner—then the companies sued by PBGC are responsible for the so-called termination liabilities:  the Plan's shortfall, plus premiums, penalties, and interest associated with the Plan, totaling approximately $6.2 million.  29 U.S.C. §§ 1362(b), 1306(a), 1307(c), 1307(d).

But asking that seemingly easy question triggers several others:  What was the effect of Liberty's 1992 bankruptcy on its status as the Plan's sponsor?  Does it matter that Wortley—sometimes using Liberty letterhead—continued to sign the forms authorizing payment to the pensioners?  If Liberty *wasn't* the Plan's sponsor, who was?  Answering them is made more difficult by an important omission:  the record does not show whether Liberty reported its bankruptcy, liquidation, and dissolution to PBGC, as it was required to do under ERISA.  As a result, two decades passed between Liberty's filing for bankruptcy and the agreement that terminated the Plan.  That delay, and the unfortunate destruction of the old bankruptcy court files under the judiciary's records retention policies, looms large as we search for answers and grapple with this case's unique circumstances.

## A

We begin by noting that, while the district court provided three reasons for its decision, "we may affirm on any ground that finds support in the record."  *Long v. Comm'r*, 772 F.3d 670, 675 (11th Cir. 2014) (citation omitted).  Both ERISA

and Illinois law provide relevant clues to solving the mystery of Liberty's existence and corporate demise.

1

Liberty was an Illinois corporation; Illinois corporations law thus lays the groundwork for its corporate status. *See Freedman v. magicJack Vocaltec Ltd.*, 963 F.3d 1125, 1133 (11th Cir. 2020) ("[C]orporations . . . are creatures of state law . . . ." (quoting *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 98 (1991))). Dissolution "terminates [an Illinois corporation's] existence" and "a dissolved corporation shall not thereafter carry on any business," except wind-up and liquidation. 805 Ill. Comp. Stat. 5/12.30(a). At common law, a corporation could no longer sue or be sued after its dissolution. *See Henderson-Smith & Assoc., Inc. v. Nahamani Family Serv. Ctr.*, 752 N.E.2d 33, 37 (Ill. App. Ct. 2001). But like most jurisdictions, Illinois has modified that rule by statute, allowing a corporation to live on for another five years beyond its dissolution. 805 Ill. Comp. Stat. 5/12.80. *See also Mich. Ind. Condo. Ass'n v. Mich. Place, LLC*, 8 N.E.3d 1246, 1250 (Ill. App. Ct. 2014) ("Section 12.80 extends the life of the corporation after its dissolution so that suits which normally would have abated may be brought by and against the corporation." (cleaned up)).

The parties sharply disagree about section 12.80's effect on a corporation's ability to serve as a contributing sponsor under ERISA. The Companies maintain

that a corporation ceases existence *for all purposes* after the five-year period, while

PBGC argues the statutory death a corporation suffers five years after its

dissolution affects only the company's ability to sue and be sued, and has no effect

on its *federally defined* role as an ERISA contributing sponsor. The Companies

rely heavily on dicta from Illinois state cases to support their position. *See, e.g.*,

*Pielet v. Pielet*, 978 N.E.2d 1000, 1008 n.3 (Ill. 2012) ("[T]he five-year extension

to a corporation's life granted by section 12.80 establishes a fixed endpoint *beyond*

*which a corporation ceases to exist*. After that point, it may no longer sue or be

sued." (emphasis added)).

But Illinois courts have not always given section 12.80 such a rigid reading.

*See, e.g.*, *Moore By and Through Moore v. Nick's Finer Foods, Inc.*, 460 N.E.2d

420, 421 (Ill. App. Ct. 1984) (holding a dissolved corporation liable outside the

then-two-year dissolution period and noting "that the two-year limitation on

corporate survival is not absolute, and may be extended under certain

circumstances"). *Moore* is flatly inconsistent with the Companies' construction of

section 12.80. And besides, *Pielet*'s discussion of Illinois's corporate-survival

statute is primarily focused on whether a dissolved corporation may *sue or be sued*.

Whether or not Illinois law would allow Liberty to sue or be sued is not the

question here; rather, we must ask instead whether Liberty had the capacity to

8

serve as the Plan's ERISA sponsor up until 2012.  That is a question of federal law, and one to which Illinois corporations law provides no answer.

B

Neither ERISA nor Illinois law tells us what to do with pension liabilities when the sponsor of a plan has dissolved but the plan has continued to operate. Where ERISA is silent, we are required "to develop a 'federal common law of rights and obligations under ERISA-regulated plans.'"  *Arnold v. Life Ins. Co. of N. Am.*, 894 F.2d 1566, 1567 (11th Cir. 1990) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)).  In deciding whether a rule should "become part of ERISA's common law," we must decide "whether the rule, if adopted, would further ERISA's scheme and goals," which are "(1) protection of the interests of employees and their beneficiaries in employee benefit plans . . . and (2) uniformity in the administration of employee benefit plans."  *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1041 (11th Cir. 1998) (per curiam) (citations omitted). *See also Bd. of Trs. of W. Conf. of Teamsters Pension Tr. Fund v. H.F. Johnson Inc.*, 830 F.2d 1009, 1014 (9th Cir. 1987) (relying on Congress's command to use "Federal substantive law" to fill in statutory gaps).

Mindful that this power to create rules that fit ERISA's purposes is to be wielded carefully and narrowly, we exercise it here.  29 U.S.C. § 1307(e)(2) establishes liability for the "controlled group" of a plan sponsor—that is, other

9

entities "under common control with" the sponsor.  29 U.S.C. § 1301(a)(14)(A).

The purpose and effect of this provision is plain:  the sponsor of a defunct pension

plan cannot be allowed to funnel its assets into other entities it owns, and then

leave PBGC holding the bag for the plan's continuing liabilities.  If a sponsor is on

the hook for unfunded pension liabilities, then every other entity sharing a

specified percentage ownership interest in common (here through Wortley) is also

on the hook, jointly and severally.  29 U.S.C. § 1307(e)(2); *see also Durango-*

*Georgia Paper Co. v. H.G. Estate, LLC*, 739 F.3d 1263, 1266 (11th Cir. 2014) ("In

the event that the contributing sponsor can no longer pay benefits when they are

due, the PBGC is authorized to terminate the plan . . . and to demand that the

contributing sponsor and the members of the controlled group provide for the

unfunded benefit liabilities." (internal citations omitted)).  Joseph Wortley owned

Liberty, and Joseph Wortley owns the Companies; there is no dispute about that.

Further, Wortley's actions on behalf of Liberty after its purported dissolution

constitute strong evidence that Liberty continued to serve as the Plan's sponsor *de

facto*, whatever its technical status under Illinois law.  For years after its

dissolution, Liberty—through Wortley—continued to authorize payments out of

the Plan.  Liberty played an active role in the Plan years after its bankruptcy; most

notably, Wortley filed with the government and the bank that held the assets in

2002 and 2004 ERISA forms that identified Liberty as the Plan's sponsor.  And

10

Wortley sent a letter to the Plan's actuary on Liberty letterhead inquiring about benefit entitlements.  These steps—necessary to the Plan's continuing maintenance—can only have been undertaken by the Plan's sponsor.

With all this in mind, we follow the Supreme Court's instruction to fill in ERISA's gaps with common-law rules, *see Firestone*, 489 U.S. at 109, and we hold that where the sponsor of an ERISA plan dissolves under state law but continues to authorize payments to beneficiaries and is not supplanted as the plan's sponsor by another entity, it remains the constructive sponsor such that other members of its controlled group may be held liable for the plan's termination liabilities.  Under the narrow rule we craft here, the Companies are liable to PBGC for the Plan's termination liabilities for the simple reason that Liberty persisted as the Plan's sponsor even as it dissolved as an Illinois corporation.

This rule "further[s] ERISA's scheme and goals" by "protecting . . . the interests of employees and their beneficiaries in employee benefit plans"—it ensures that a plan such as this does not go without a sponsor—and it promotes "uniformity in the administration of employee benefit plans" by clarifying that disparate state corporations laws are not the sole factor in determining a sponsor's identity.  *Horton*, 141 F.3d at 1041.  By contrast, giving credence to the Companies' overly broad view of Illinois law would mean leaving the government agency to pick up the Plan's tab rather than first exhausting any funds that might

11

be kept in Wortley's other entities, and it would make the definition of sponsor entirely dependent on state laws that may differ widely on a corporation's post-dissolution status.[2]

The Companies claim that Liberty cannot have been the Plan's sponsor, but they provide no possible alternative sponsor. PBGC insists that it was never notified at the time of Liberty's bankruptcy in 1992 that the company was dissolving so that it could lodge an appropriate claim as a creditor to the bankrupt corporate estate and make provision for protecting retirees' future benefit payments. The government agency has no record of any such communications and the bankruptcy court file that might contain the answer no longer exists. And the Companies point to no provision of ERISA that contemplates a plan without a sponsor—certainly, no provision that contemplates a plan continuing to operate and pay out pension benefits for twenty years after the purported dissolution of its sponsor while apparently failing to meet its notification requirements to PBGC. Ruling for the Companies would mean holding that an extant pension plan may be left without a sponsor for decades, which could have vast ripple effects across even

---

[2] To be sure, we do not hold that ERISA *preempts* Illinois corporations law. *See Graham v. R.J. Reynolds Tobacco Co.*, 782 F.3d 1261, 1275 (11th Cir. 2015) (the "presumption against preemption" means "the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress" (citation omitted) (alteration in original) (overruled on other grounds by *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169 (11th Cir. 2017) (en banc))). Rather, we clarify that it is ERISA—not Illinois law—that determines the identity of a plan's sponsor in a situation such as this.

unrelated provisions of ERISA. *See, e.g.*, 29 U.S.C. § 1082(c)(4)(A)(ii) (naming a plan's sponsor as one party that may perfect a security interest as part of a minimum-funding waiver); § 1083(c)(2)(D)(vi)(I) (requiring a plan's sponsor to use certain segment rates in determining waiver amortization installments). The implication that an ERISA plan may function without a sponsor risks chaos by muddying the meaning of these sections and others that depend on an ascertainable sponsor. We decline the Companies' invitation to create this uncertainty in ERISA law.

Because we craft this common-law rule to conclude that Liberty remained the Plan's sponsor until the execution of the 2012 agreement, we do not reach the parties' other arguments or the district court's other findings.

IV

We hold that—under the particular circumstances presented here, and mindful of ERISA's scheme and protectionist goals—the Companies owned by Joseph Wortley are liable for the Plan's termination liabilities notwithstanding Liberty's apparent dissolution under Illinois law. The judgment of the district court is

AFFIRMED.